**A QUAKER ACTION GROUP et al.**

**v.**

**Walter J. HICKEL et al., Appellants.**

**No. 22983.**

United States Court of Appeals
District of Columbia Circuit.

Argued May 9, 1969.

Decided June 24, 1969.

Mr. Morton Hollander, Atty., Dept. of Justice, with whom Messrs. Alan S. Rosenthal and Ralph A. Fine, Attorneys,

Dept. of Justice, were on the brief, for appellants. Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty., at the time the brief was filed, Joseph M. Hannon and Gil Zimmerman, Asst. U. S. Attys., also entered appearances for appellants.

Mr. William A. Dobrovir, Washington, D. C., with whom Messrs. Joseph L. Rauh, Jr., James F. Fitzpatrick, Ralph J. Temple and Lawrence Speiser, Washington, D. C., were on the brief, for appellees.

Before BAZELON, Chief Judge, BURGER * and ROBINSON, Circuit Judges.

BAZELON, Chief Judge:

The plaintiff-appellees are several organizations that wish to conduct demonstrations on the sidewalk in front of the White House and in Lafayette Park, which faces the White House across Pennsylvania Avenue. Because they believe that certain regulations and implementing policy directives of the Department of the Interior abridge their First Amendment rights to assemble and petition the President by limiting the size of such demonstration and requiring a permit beforehand, the plaintiffs brought suit for a declaratory judgment that these restrictions are unconstitutional and for a permanent injunction against their enforcement. As an incident of this litigation, the District Court granted a preliminary injunction forbidding the defendants from interfering with the specific demonstrations planned, from imposing numerical restrictions on the size of demonstrations, and from enforcing the regulations requiring a prior permit.

In this appeal the Government claims that the trial judge abused his discretion in granting the preliminary injunction pending decision of the case in chief. For the reasons outlined below, we reject this contention. Because of the peculiar sensitivity of one issue involved— the safety of the President—we modify the injunction granted by the district judge, however, to permit the Department of the Interior to require a prior notice of planned demonstrations that will allow the Government, if it wishes, to seek a court order enjoining a particular demonstration.

I

The Department of the Interior has had exclusive jurisdiction over the sites in question since 1898. Although a departmental regulation, 36 C.F.R. § 50.19,[1]

---

* Circuit Judge Burger did not participate in the disposition of this case.

1. 36 C.F.R. § 50.19 (1968) provides in relevant part:

(a) As used in this section the term "public gatherings" shall mean parades, ceremonies, entertainments, meetings, assemblies, and demonstrations. It does not include events for commercial purposes.

*     *     *     *     *

(c) Public gatherings may be held and speeches may be made in any park area under the jurisdiction or subject to regulatory authority of the National Capital Region, which shall mean and include any sidewalk in the District of Columbia contiguous to such park area, subject to the condition that an official permit therefor be first issued by the park Superintendent. Use of the areas set forth in paragraph (b) of this section, or sidewalks contiguous thereto, in accordance with the terms of that paragraph, shall not be subject to the requirements of this paragraph.

(1) *Application for permit.* Any application for such an official permit shall set forth the name of the applicant, the date, time, duration, nature, and place of the proposed event, an estimate of the number of persons expected to attend and a statement of equipment and facilities to be installed for use in connection therewith.

(2) *Issuance of permit.* The park Superintendent shall issue an official permit upon proper application unless:

(i) A prior application for the same time and place has been made which has been or will be granted.

(ii) The event will present a clear and present danger to the public health or safety.

(iii) The event is of such nature or duration that it cannot reasonably

has for some years required a permit for any public demonstration in these and other areas under its control, no permit was in fact ever required for gatherings in Lafayette Park and on the White House sidewalk until August 10, 1967. On that date the regional director of the National Park Service, which is part of the Department, released a memorandum stating that the regulation would henceforth be enforced. The memorandum also added a new ground for denying a permit to the three appearing in the regulation: "No permit will be issued for the South sidewalk of Pennsylvania Avenue to a group of more than 100 persons. * * * No permit will be issued for Lafayette Park to a group of more than 500 persons." [2]

The memorandum contained no explanation for these numerical restrictions. A letter written later in the month by a Department of the Interior spokesman to a civil liberties organization, however, stated that the regional director had concluded "upon the basis of past experiences" that demonstrations larger than 500 persons in Lafayette Park would cause "permanent damage or subject the Government to substantial continued expenditures * * * for replacing injured shrubs and other plants." As for the White House sidewalk, the letter continued that large demonstrations "have a distracting effect on motorists" driving along Pennsylvania Avenue. "In addition, there have been occasions when pedestrian traffic has been forced off the sidewalk into the street."

Since August 1967 the regulations have been enforced, and protestors lacking a permit have been arrested. Mindful of these events, four of the five plaintiff organizations in this case sent letters on March 6 of this year requesting permits from the National Park Service for demonstrations they wished to hold in late April and early May. The Clergy and Laymen Concerned About Vietnam and the Women's Strike for Peace requested approval for demonstrations on the White House sidewalk at which they expected, respectively, 3,000 and 1,000 participants.

On March 13 the regional director of the Park Service wrote them that "taking into account pedestrian and vehicular traffic in the area, a demonstration of the magnitude indicated in your application cannot be reasonably accommodated. * * *" On the same day he declined to issue a permit to the Jews for Urban Justice until they furnished an estimate of the number of persons expected to participate in their planned sidewalk demonstration. Finally, the Action Committee on American-Arab Relations was told that the construction-rehabilitation work now going on in Lafayette Park precluded public demonstrations of any kind there.

After the denials of their applications, the plaintiffs filed this action on March 19, joined by a fifth organization, A Quaker Action Group, which also wished to hold a demonstration but had not applied for a permit because it feared that the number of participants might exceed the numerical limitations placed on such demonstrations and thus subject all its participants to arrest. In support of their allegations the plaintiffs filed numerous affidavits to demonstrate (1) the importance of the right to hold large demonstrations in Lafayette Park and on the White House sidewalk; (2) that much larger demonstrations than those permitted by the Department of the Interior could be accommodated in these

---

be accommodated in the particular area applied for.

(3) *Conditions.* The permit may contain such conditions as are reasonably consistent with protection and use of the area for the purposes for which it is maintained and as are otherwise consistent with the regulations in this part. It may also contain reasonable

limitations on the time and area within which the event is permitted.

(i) Violation of any terms of the permit may result in its cancellation. * * *

2. For the reasons for denying a permit provided by the regulation, see 36 C.F.R. § 50.19(c) (2) (i)–(iii), *supra* note 1.

areas without interfering with pedestrian traffic or other activities such as White House tourism; (3) that the permit system has been applied in an arbitrary and capricious way to harass would-be demonstrators or to deny permits altogether even though the numerical restrictions were not exceeded.

The Government on March 28 filed a memorandum in opposition to the motion for a preliminary injunction which advanced for the first time the safety of the President as a rationale for the restrictions upon demonstrations near the White House. In an accompanying affidavit, the present regional director of the Park Service stated that he had "carefully reviewed the policy determinations" and concluded that the security of the White House as well as the previously elaborated considerations of pedestrian and vehicular traffic required enforcement of the permit system with its numerical limits. The Government also submitted an affidavit executed by the director of the Secret Service, Mr. James Rowley, who stated that "the attendant security problems are such as to warrant keeping demonstrations entirely away from the south sidewalk on Pennsylvania Avenue * * * and the Lafayette Park area." Mr. Rowley rehearsed at some length the "problems of great magnitude" in "maintaining the security of the Executive Residence" because of its location in the center of a metropolitan area with a constant flow of tourists. His statement went on to describe, without reference to specific incidents, the difficulties encountered with protest demonstrations: "Situations with such dangerous potential for mass violence have occurred in close proximity to the White House on a number of occasions, and have resulted in blockage of gates and entrances leading to the Executive Residence and grounds, and in arrests for disorderly conduct."

At the hearing before the district court, the Government stipulated that it did not controvert the matters of fact set forth in the plaintiffs' evidentiary submissions, although the plaintiffs did not return the favor. After considering the matter for several weeks, the district court issued a preliminary injunction, accompanied by conclusions of fact and law. This court refused to stay the injunction pending an appeal; the Government then sought and obtained a stay from the Chief Justice of the United States until this court could decide the Government's appeal, which we have expedited.

## II

The decision to grant a preliminary injunction normally lies in the discretion of the trial judge,[3] and our scope of review is accordingly limited. Although the parties to this appeal have addressed lengthy briefs to the constitutionality of the restrictions placed upon demonstrations before the White House, our task is not to resolve the merits of that dispute.[4] This is particularly true in this case since the Government has stipulated to the truth of the plaintiffs' affidavits only for purposes of the preliminary injunction.[5] We limit our gaze accordingly to the issues of whether the trial judge abused his discretion in granting the injunction,[6] or rested his analysis upon an erroneous premise.[7]

3. See, e. g., Public Serv. Comm'n of Wisconsin v. Wisconsin Tel. Co., 289 U.S. 67, 70, 53 S.Ct. 514, 77 L.Ed. 1036 (1933).

4. See, e. g., Industrial Bank of Washington v. Tobriner, 132 U.S.App.D.C. 51, 54, 405 F.2d 1321, 1324 (1968); Young v. Motion Picture Ass'n, 112 U.S.App. D.C. 35, 37, 299 F.2d 119, 121 (1962).

5. Cf. Fed.R.Civ.P. 65(a) (2).

6. See, e. g., Industrial Bank of Washington v. Tobriner, 132 U.S.App.D.C. 51, 54, 405 F.2d 1321, 1324 (1968); Liberty Lobby v. Pearson, 129 U.S.App.D.C. 74, 75, 390 F.2d 489, 490 (1968); Maas v. United States, 125 U.S.App.D.C. 251, 254, 371 F.2d 348, 351 (1966); Young v. Motion Picture Ass'n, 112 U.S.App. D.C. 35, 37, 299 F.2d 119, 121 (1962); Cox v. Democratic Central Comm., 91 U.S.App.D.C. 416, 200 F.2d 356 (1952).

7. See, e. g., District 50, United Mine Workers of America v. International Union, 134 U.S.App.D.C. 34, 412 F.2d

■ The standards which should guide the decision to grant a preliminary injunction have been often stated.[8] The movant must show a substantial likelihood of success on the merits, and that irreparable harm would flow from the denial of an injunction. In addition, the trial judge must consider the inconvenience that an injunction would cause the opposing party, and must weigh the public interest as well.

The trial judge in this case did not proceed from an erroneous premise. He found, in so many words, that "plaintiffs are likely to prevail on the merits of this action;" that "any delay in the exercise of First Amendment rights constitutes an irreparable injury to those seeking such exercise;" and that "the convenience to defendants of continuing to enforce the numerical limitations and the permits requirements * * * is greatly outweighed by the harm to plaintiffs and all other citizens of deprivation of First Amendment rights."

■ We also do not find that the trial judge abused his discretion or was clearly wrong in reaching these conclusions. "The right of the people peaceably to assemble, and to petition the Government for a redress of grievances"[9] is so basic to our society that any deprivation might well be found to constitute irreparable injury. But we need not rely on any flat rule in this case. The plaintiffs wished to hold specified demonstrations of substantial size requiring advance planning. For this reason, as well as because of the timeliness of their issues, the plaintiffs were entitled to demand prompt relief rather than hold their plans in abeyance pending the final outcome of litigation.

■ The likelihood of their success on the merits presents a more troubling issue. The decisions of the Supreme Court demonstrate the difficulty of balancing the vital right of protest against the legitimate governmental interests of public order and safety.[10]

In this case the fact that plaintiffs wish to demonstrate in areas open to the public argues for their cause.[11] The affidavits submitted to show that the sidewalk in front of the White House could easily accommodate, as it has in the past,[12] groups much larger than 100 without preventing the movement of pedestrians also supports the conclu-

---

165 (April 10, 1969); Perry v. Perry, 88 U.S.App.D.C. 337, 338, 190 F.2d 601, 602 (1951).

8. *See, e. g.*, Industrial Bank of Washington v. Tobriner, 132 U.S.App.D.C. 51, 54, 405 F.2d 1321, 1324 (1968); Liberty Lobby v. Pearson, 129 U.S.App.D.C. 74, 75, 390 F.2d 489, 490 (1968); National Lawyers Guild v. Brownell, 96 U.S.App.D.C. 252, 225 F.2d 552, 554 (1955), cert. denied 351 U.S. 927, 76 S.Ct. 778, 100 L.Ed. 1457 (1956); Perry v. Perry, 88 U.S.App.D.C. 337, 338, 190 F.2d 601, 602 (1951); Communist Party v. McGrath, 96 F.Supp. 47, 48 (D.D.C.1951) (concurring opinion of Bazelon, C. J.); *cf.* Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958).

9. U.S.Const. Amend. I.

10. *See generally* Carroll v. President & Comm'rs of Princess Anne County, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); Adderley v. Florida, 385 U.S.

39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. Louisiana, 379 U.S. 536, 559, 85 S.Ct. 453, 476, 13 L.Ed.2d 471, 487 (1965); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

11. *See* Adderley v. Florida, 385 U.S. 39, 41, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

12. A study of White House demonstrations before implementation of 36 C.F.R. § 50.19, as reported by local newspapers, showed that many large protests have occurred without serious trouble occurring. At various times as many as 6,000 people have demonstrated on the sidewalk, and as many as 30,000 in Lafayette Park.

sion.[13]  And although the record indicates that three antiwar protestors were arrested for flower-picking in October 1967, we agree with the District Judge that the need to protect plants and shrubbery cannot alone justify restrictions of the sort imposed upon demonstrations in Lafayette Park (when it is again opened).

The Supreme Court in Cox v. Louisiana (Cox II) [14] upheld on its face a statute which prohibited picketing or parading "in or near a building housing a court" with "the intent of interfering with, obstructing, or impeding the administration of justice * * *." [15] That case, however, dealt with a criminal statute punishing conduct accompanied by a requisite element of intent.  We deal here with a system of prior restraint, where the Government must bear a heavier burden of justification,[16] which prohibits some demonstrations and inconveniences all would-be protestors without regard to their motives or a showing of actual danger in the individual case.

Moreover, there was no allegation in *Cox II* that the statute had been abused by a pattern of arbitrary and capricious application.  The plaintiffs in this case have submitted numerous affidavits to show that the Park Service has denied some requests for permits without reason even though the numerical restrictions were not violated, and has harassed other applicants by requiring repeated appearances to obtain a permit and by delaying action on other applications.  Two of these incidents—which the Government has explicitly not controverted—involved prior applications by representatives of the plaintiff organizations.

■ These considerations would, absent other factors, persuade us that the plaintiffs have a substantial expectancy of prevailing on the merits.  But the Government has injected an additional, and most important, element into the case by arguing that large demonstrations threaten the safety of the President.  This, of course, is a paramount interest [17] underscored in importance by the tragic assassinations in recent years.  But we cannot agree with the Government's argument that mere mention of the President's safety must be allowed to trump any First Amendment issue.  While courts must listen with the utmost respect to the conclusions of those entrusted with responsibility for safeguarding the President, we must also assure ourselves that those conclusions rest upon solid facts and a realistic appraisal of the danger rather than vague fears extrapolated beyond any foreseeable threat.

■ The Government suggests that the importance and delicacy of any decision affecting the President's safety requires this court to limit its review to a

13. Depending upon the assumptions made concerning demonstrator density and rate of circulation, it was estimated that between 4,380 and 6,510 people could occupy the White House sidewalk and still leave a pedestrian corridor sufficiently wide to accommodate the maximum number of pedestrians who pass the White House.

14. 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed. 2d 487 (1965).

15. *Id.* at 560, 85 S.Ct. at 478.  The statute also forbade picketing or parading with "the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty * * *."  Since courts, unlike legislatures or the executive, traditionally are not expected to act with an eye to public opinion, this part of the statute, appropriate where a court was concerned, would hardly be permissible where the legislature or the executive branch is concerned.

16. *See, c. g.*, Carroll v. President & Comm'rs of Princess Anne County, 393 U.S. 175, 181, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); Freedman v. Maryland, 380 U.S. 51, 57, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Bantam Books Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

17. "The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive * * *." Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (April 22, 1969).

determination whether the decision was "wholly irrational." We do not agree. The expertise of those entrusted with the protection of the President does not qualify them to resolve First Amendment issues, the traditional province of the judiciary. A balancing of First Amendment freedoms against the requirements of Presidential safety may be left to other agencies in the first instance. But absent a compelling showing—which has not been begun here—that courts cannot evaluate the questions of fact involved in estimating danger to the President, the final judgment must rest with the courts. To enable the court to reach a reasoned conclusion, it is incumbent upon any party who would invoke Presidential safety as a paramount consideration to provide the court with the information necessary to an even-handed decision.

In this case the plaintiffs have shown by uncontested affidavits that many large demonstrations have occurred near the White House with few arrests and no evidence of attempts to harm its occupant. The history of this country, moreover, records no effort of which we are aware to assault a public figure by mass violence; assassinations have characteristically been the work of single individuals or at most small groups.

The Government advances only the affidavit of the director of the Secret Service, who states that "situations with * * * [a] dangerous potential for mass violence have occurred in close proximity to the White House. * * *" But we are told neither of any specific cases, nor of any concrete reasons to expect mass violence directed toward the President in the future. Demonstrations do sometimes lead to excesses; but there is a wide gulf between disorderliness on Pennsylvania Avenue and a storming of the White House over a tall, pointed steel fence and across 230 feet of lawn.

We do not suggest that the Government may not be able to show at trial

that large demonstrations may threaten the safety of the Chief Executive. But we do hold that the Government must in fact show such a danger rather than simply advance its conclusion as a determination binding upon the courts. In the context of a preliminary injunction, the burden upon the Government may be lighter, but does not disappear. There has been no effort here to justify the Government's argument beyond the flat words of the Secret Service director. First Amendment rights are too precious for sacrifice upon such an unsupported altar.

There remains the relative convenience of the parties and the public interest to be considered.[18] The plaintiffs, as outlined above, have shown in detail the harm they would suffer from the denial of a preliminary injunction. The Government rests upon the assertion that the President's safety must bar relief. But the Government has provided the court with no information concerning possible alternative means to protect the White House. Presumably the director of the Secret Service, who protects the President at parades, official functions and sporting events, could provide some estimates of the man power needed to insulate the White House against any assault from the sidewalk. The plaintiffs have suggested other alternatives, such as strengthening or even electrifying the fence along Pennsylvania Avenue. The Government does not tell us whether any of these steps would be feasible, or whether they have been considered.

■ In a suit involving private parties, we might well find that such a failure of proof entitled the appellant to the consequences. But the safety of the President cannot be endangered merely because the Government has wholly failed to support its arguments. The showing made by the plaintiffs provides the "persuasive demonstration"[19] necessary for the grant of a preliminary injunction. We cannot find that the trial judge

18. *See* Yakus v. United States, 321 U.S. 414, 440–441, 64 S.Ct. 660, 88 L.Ed. 834 (1955).

19. District 50, United Mine Workers of America v. International Union, No. 22,028, Slip Op. at p. 2 (April 10, 1969).

abused his discretion, and decline to reverse his decision. To assure the safety of the President, however, we believe that the injunction should be modified [20] to permit the enforcement of 36 C.F.R. § 50.19 to the extent of requiring that groups wishing to protest provide notice to the Park Service of planned demonstration 15 days before the event.[21] If the Government wishes, it may then seek to enjoin the demonstration through judicial action.

We conclude that such an arrangement pending the determination of this lawsuit on its merits will permit the parties responsible for the safety of the President to carry out their duties while minimizing the dangers to First Amendment freedoms presented by the numerical restrictions upon demonstrations and the requirement of a prior permit that may be denied or delayed for arbitrary reasons.

So ordered.

20. *See* 28 U.S.C. § 2106 (1964) ; Beverage Distributors, Inc. v. Olympia Brewing Co., 395 F.2d 850 (9th Cir. 1968).

21. We stress that this arrangement is devised strictly, on the basis of an incomplete record, for the pendency of the lawsuit, and is in no ways binding upon the trial court in its determination of the merits and appropriate relief, if any.