**ENERGY ACTION EDUCATIONAL FOUNDATION, et al., Appellants,**

v.

**Cecil D. ANDRUS, Secretary of the Interior, et al. (two cases).**

Nos. 79–1768, 79–1787.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 12, 1979.

Decided Dec. 20, 1979.

John Silard, Washington, D. C., with whom Joseph L. Rauh, Jr. and Jonathan I. Schiller, Washington, D. C., were on the brief, for appellants.

Robert L. Klarquist, Atty., Dept. of Justice, Washington, D. C., with whom Sanford Sagalkin, Acting Asst. Atty. Gen., Peter R. Steenland, Jr., Bruce C. Rashkow and Larry A. Boggs, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

E. Edward Bruce, Mark D. Nozette and Jan Schneider, Washington, D. C., were on the brief, for amicus curiae urging the orders to be dismissed in No. 79–1768.

Before LEVENTHAL [*] and WALD, Circuit Judges, and NICHOLS [**], Judge, United States Court of Claims.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

Concurring opinion filed by Circuit Judge WALD.

LEVENTHAL, Circuit Judge:

In this case we are asked to decide whether the bidding systems currently employed by the Secretary of the Interior in leasing government offshore properties for oil and natural gas development comply with the Outer Continental Shelf Lands Act,[1] as substantially amended in 1978. Appellants challenge two district court orders denying their request to enjoin the Secretary from conducting further lease sales until alternative bidding systems are used. Although we cannot say whether the Secretary is implementing the amendments as expeditiously as possible, we are convinced that he has not contravened the letter of the law. Accordingly, we affirm both orders of the district court.

## I. BACKGROUND

Since the enactment in 1953 of the Outer Continental Shelf Lands Act (OCS Act), the federal government has been actively engaged in leasing OCS lands[2] to private companies for the exploration and development of oil and natural gas deposits. The original act delegated broad authority to the Secretary of Interior for implementing and administering the legislation, but it was uncharacteristically specific with respect to lease bidding procedures. The Secretary was directed to conduct competitive bidding by sealed bids under one of two alternative formulas. He could solicit bids either (a) on the basis of a cash bonus bid with a fixed royalty (fixed at no less than 12½% of the gross revenue of the lease), or (b) by a royalty rate bid with a fixed cash bonus payment.[3] As between these two methods, the Secretary's discretion was not limited. Until recently, virtually all leases made under the OCS Act were issued through the cash bonus-fixed royalty alternative, with the royalty set in advance of bidding at 16⅔% (one-sixth) of the gross value of the production.[4] Under that procedure, a lease would be awarded to the responsible qualified bidder with the highest cash bid on a given tract, assuming the bid was deemed to provide an adequate return to the government on the tract.

Several critical events during the mid-1970s necessitated a massive revision of the OCS Act.[5] Most prominently, the nation's increasing dependence on foreign sources of energy, laid bare by the oil embargo of 1973, caused many in government to turn to the Outer Continental Shelf as a potential, though unproven, supply of American short-range energy needs. At the same time, the prospects of greater offshore oil and gas production—and the increased consciousness of environmental protection concerns—spurred local governments and environmental groups to seek a greater role in regulating future OCS ventures.

---

[*] Judge Leventhal authored this opinion but died before it was released.

[**] Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. 43 U.S.C.A. § 1331 et seq. (West Supp. 1979).

2. The term "Outer Continental Shelf" has been defined as all submerged lands lying seaward and outside State waters (three miles), "and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." 43 U.S.C. § 1331(a). With few exceptions, most OCS leasing to date has involved tracts in the Gulf of Mexico. Only recently has the government opened to bidding the "frontier areas" in the Pacific and Atlantic Oceans. See generally H.R.Rep.No.95–590, 95th Cong., 1st Sess. 65–74 (1977), U.S.Code Cong. & Admin.News 1978, p. 1450.

3. 43 U.S.C. § 1337(a) (1976).

4. Between the original passage of the OCS Act and the initiation of this action, the Secretary had conducted 47 oil and gas lease sales in which 3,450 leases had been awarded. See Joint Appendix (J.A.) at 179.

5. See generally H.R.Rep.No.95–590, 95th Cong., 1st Sess. (1977).

Other developments more directly pointed to inadequacies in the bidding system used in leasing OCS lands. The dramatic increases in the price of oil and natural gas made it evident that the cash bonus-fixed royalty system of bidding led to a situation wherein the total royalties paid to the government were declining as a percentage of gross proceeds on wells. Several reports issued by the Comptroller General beginning in 1975 expressed the strong reservation that the cash bonus-fixed royalty system could not assure the government a fair return on its leases.[6] In addition, those reports indicated that the cash bonus system had anticompetitive effects, leaving smaller operations, with fewer financial resources, relatively unable to compete, given the high front-end cash bonus payments and the many uncertainties associated with exploring untested areas. The Interior Department's own experimentation on two occasions with the alternative system, royalty bidding, seemed to confirm that cash bonus-fixed royalty bidding did not generate sufficient competition nor produce adequate returns to the government.[7]

Congress responded to the divergent stimuli for reform with the comprehensive Outer Continental Shelf Lands Act Amendments of 1978. These amendments reflect the often competing concerns for environmental protection, cooperation among all interested parties, and the acceleration of OCS oil and gas development. Most provisions of the amendments have no bearing on the case before us; a few, however, are central to this appeal. Congress expressly retained the two bidding systems previously authorized, but it added five other specific alternatives as well as any non-enumerated system the Secretary determines to be useful to accomplish the purposes and policies of the amendments.[8] The Secretary of Interior retains his discretion in selecting among alternative bidding systems, though he is restrained to some extent by percentage limits on the use of certain systems.[9] In addition, although the Interior Secretary is to conduct all lease sales under the Act, it is the Secretary of the Department of Energy who, in consultation with the Interior Secretary, must promulgate regulations governing the use of each particular new bidding system.[10] The Secretary of Energy annually, and the Interior Secretary with each lease sale, must report to Congress concerning the use and nonuse of the various OCS bidding options.[11] Finally, a new section was added to the OCS Act requiring the Secretary of Interior to prepare and maintain a comprehensive oil and gas leasing program to implement the different policies of the Act.[12] That program must adhere to several principles spelled out in the statute, including a balanced considera-

---

**6.** See id. at 110–11; S.Rep.No.95–284, 95th Cong., 1st Sess. 60–68 (1977); J.A. 47–50.

**7.** See H.R.Rep.No.95–590, 95th Cong., 1st Sess. 138–39 (1977).

In testimony before Congress, then-Secretary of the Interior Rogers Morton conceded that fair market value might not be obtained by cash bonus leases in light of escalating prices:
[O]n the Outer Continental Shelf, we have been collecting 16⅔ percent of all of the production. You might say, and I think very well say, this is not a high enough percent because we really don't get true value, if, at the time the bonus is bid, oil is selling at $5 and then it goes up to $10. The 16⅔ percent royalty is not high enough. We are examining that.
Hearings on S.Res. 45 and S.Res. 222 Before the Senate Committee on Interior and Insular Affairs and the Senate Committee on Commerce 94th Cong., 1st Sess. 68 (1975).

**8.** 43 U.S.C.A. § 1337(a)(1) (West Supp. 1979).

**9.** 43 U.S.C.A. §§ 1337(a)(1), (a)(5)(B) (West Supp. 1979). Section 8(a)(5)(B) of the OCS Act requires the Secretary to use alternatives other than cash bonus-fixed royalty bidding on 20–60% of all acreage offered for leasing each year and for the next five years.

**10.** Under Section 302(b)(2) of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. § 7101 et seq., the responsibility of the Secretary of the Interior to promulgate regulations implementing OCS alternative bidding systems was transferred to the Secretary of Energy. 42 U.S.C.A. § 7152(b)(2) (West Supp. 1979). See H.R.Rep.No.95–1474, 95th Cong., 2nd Sess. 77–78, 90 (1978) (conference report).

**11.** See 43 U.S.C.A. §§ 1337(a)(8), (9), 1343(2) (West Supp. 1979).

**12.** Id. at § 1344.

tion of economic, social, and environmental concerns and the assurance of a fair market value on leased land to the government.[13]

This litigation grows out of the Interior Secretary's continued partial use of the cash bonus-fixed royalty bidding system. Between the effective date of the OCS Act amendments[14] and the date on which this lawsuit was filed, three OCS lease sales were conducted. In each instance the Secretary chose cash bonus-fixed royalty bidding for part of the tracts to be leased, while using another bidding system—a cash bonus system with a fixed non-linear (semi-logarithmic) sliding scale royalty[15]—for the other tracts. Four other lease sales, scheduled to take place between June and November of 1979, planned to utilize the same mix of alternative bidding systems. Bids on the first of these, Lease Sale 48, were scheduled for opening on Friday, June 29, 1979.

Appellants, consisting of nine consumer organizations, three private citizen-taxpayers, and two California governmental entities,[16] commenced this litigation in the District Court for the District of Columbia on June 22, 1979. Naming the United States, the Secretary of Interior, and the Secretary of Energy as defendants, appellants sought declaratory and injunctive relief leading to the suspension of all OCS leasing "until the Secretary of Energy has promulgated regulations governing use of all alternative bidding systems authorized in [the OCS Act], as amended, including systems allowing for the sharing of net profits."[17] Appellants also asked for an injunction against further leasing under the cash bonus-fixed (16⅔%)

royalty as well as a full investigation of existing leases and corrective action should it be demonstrated that they will not yield a fair return to the government.

The essence of appellant's complaint is that cash bonus-fixed royalty bidding, particularly with the royalty fixed at 16⅔%, cannot yield fair market value nor generate adequate competition as mandated by the amended OCS Act. Only through the issuance and use of regulations authorizing alternative systems, most notably the profit-sharing options, can the government achieve the statutory objectives. However, according to appellants, issuance of those regulations has been unduly delayed by a "jurisdictional squabble" between the Departments of Energy and the Interior.[18]

On June 25, 1979, four days prior to the scheduled opening of bids on Lease Sale 48, appellants filed a motion for a preliminary injunction seeking to prevent further lease sales "in the absence of regulations establishing the full range of bid systems mandated by the Outer Continental Shelf Lands Act."[19] A hearing on the motion was held on June 27. Later that day, District Judge Aubrey E. Robinson, Jr. denied appellant's preliminary injunction motion. In its Memorandum and Order, the district court ruled that plaintiffs had not shown a likelihood of prevailing on the merits.[20] The statutory scheme laid out in the 1978 amendments was not violated in lease sales subsequent to their enactment. To the contrary, the court found that the Secretary's partial use of the cash bonus-fixed royalty system complied fully with the statutory requirement that a mix of that system with others be

---

13. Id. at § 1344(a).

14. The amendments became effective on September 18, 1978.

15. Under this system the lessee pays a percentage royalty on a schedule fixed in advance by the Secretary in which the payment percentage increases as the scale of production increases.

16. The fourteen appellants are: Energy Action Educational Foundation; Consumer Federation of America; Consumer Energy Council of America; Michigan Citizens Lobby; Arkansas Consumer Research, Inc.; Service Employees International Union; International Association

of Machinists; Citizen/Labor Energy Coalition; Texas Consumer Association; M. James Doling; Paul Casagrande; Kathleen F. O'Reilly; California State Lands Commission; and the City of Long Beach, California.

17. J.A. 76.

18. Pet.Br. at 3, 13–14.

19. J.A. 129.

20. J.A. 293.

used and could not be found to violate the purposes of the OCS Act. The court further determined that the defendants had not acted arbitrarily or capriciously in failing to promulgate regulations as yet regarding some of the alternative bidding systems "in light of the complexity and sensitivity involved in preparation of such regulations."[21] Finally, the court found adequate safeguards against improper use of bidding options in the Congressional oversight scheme incorporated in the Act.

Appellants did not appeal this order but on June 28 moved for modification of that order so as to restrain the defendants from awarding cash bonus-fixed royalty leases under Sale 48.[22] The next day, as scheduled, the Secretary opened Sale 48 bids. Shortly thereafter, the appellants again filed a motion seeking modification of the June 27 order, maintaining that the results of bidding on Lease Sale 48 indicated that acceptance of the bids would contravene the fair market value and competition requirements of the OCS Act. In a brief order, the district court denied this motion, reasoning that appellants had "still failed to show that utilization of the cash bonus-fixed bidding system with a 16⅔% fixed royalty violates the Outer Continental Shelf Lands Act."[23]

This appeal, expedited as required by statute,[24] ensued. Both the district court and this court denied applications for a stay pending appeal of the Secretary's award of leases under Sale 48.

## II. ANALYSIS

To some extent the procedural posture of this case narrows our scope of review. This court has often observed that the grant or denial of a preliminary injunction motion normally lies within the discretion of the trial judge. An appellate court's review is limited to determining whether the district judge abused his discretion, "or rested his analysis upon an erroneous premise."[25] Nevertheless, when the district court's action rests on an interpretation of the applicable law, that interpretation is reviewable fully and de novo in the appellate court.[26] Inasmuch as the district judge drew support from his reading of the OCS Act amendments, we are compelled to examine the meaning of the statute.

It cannot be gainsaid that Congress was deeply concerned with the assurance of fair market value and adequate competition in OCS leasing. Both the legislative history[27] and the 1978 amendments themselves[28] address those interests. Furthermore, it may well be that cash bonus-fixed royalty bidding is less likely to maximize those aims and that, conversely, profit-sharing or other alternative bidding systems might be more successful in that regard.[29]

21. J.A. 294.

22. J.A. 296. This request was rendered moot by appellees' representation that by statute awards would be delayed at least 30 days in order to afford the Attorney General an opportunity to conduct a review of the sale's competitive effects. J.A. 306 n.1.

23. J.A. 549.

24. 43 U.S.C.A. § 1349(d) (West Supp. 1979).

25. *A Quaker Action Group v. Hickel*, 137 U.S. App.D.C. 176, 180, 421 F.2d 1111, 1115 (1969). *See also National Ass'n of Greeting Card Publishers v. U.S. Postal Service*, 186 U.S.App.D.C. 331, 363, 569 F.2d 570, 602 (1976); *Natural Resources Defense Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 10, 458 F.2d 827, 832 (1972).

26. *Delaware & Hudson Ry. Co. v. United Transportation Union*, 146 U.S.App.D.C. 142, 159, 450 F.2d 603, 620 (1971).

27. *See, e. g.*, H.R.Rep.No.95–590, 95th Cong., 1st Sess. 47, 54 (1977); S.Rep.No.95–284, 95th Cong., 1st Sess. 43, 46, 47 (1977); J.A. 51–56.

28. *See, e. g.*, 43 U.S.C.A. §§ 1332(3), 1337(c), 1343, 1344(a)(4), (d), 1802(2) (West Supp. 1979).

29. Appellants amassed substantial evidence to demonstrate the superiority of a profit-sharing bidding system over the cash bonus-fixed royalty option. They pointed to the successful experience with profit-sharing of other oil and natural gas lessors, such as the State of California and several foreign countries. J.A. 39–44. They also found support in the government's own experiences with alternative systems and its many concessions that a profit-sharing system could best assure the receipt of fair market value and competition for tracts. J.A. 40–41, 46, 52–53, 68–69. This evidence did not escape the legislators' purview. *See* S.Rep.No.95–284, 95th Cong., 1st Sess. 73 (1977).

In addition, we can assume, *arguendo*, the accuracy of appellants' assertion that the emergence of profit-sharing regulations has been hampered by inter-agency disputes.[30] Nonetheless, bearing in mind the competing policies underlying the amendments and the explicit language of the revisions, the real question before us is whether the continued partial use of cash bonus-fixed royalty bidding—as planned for the near future by the Secretary—violates the statutory scheme. We hold that it does not.

Congress enacted the provisions dealing with lease bidding after exhaustively reviewing the Secretary's 25-year record of administering the OCS Act. It cannot be doubted that Congress had the opportunity to discard the cash bonus-fixed royalty system or to restrain the Secretary's discretion in according it substantial use. In essence, it chose to do neither.

Congress declined to omit cash bonus-fixed royalty bidding when it rewrote § 8(a) of the OCS Act. That section continues to provide that lease bidding, "at the *discretion* of the Secretary," may be on the basis of cash bonus-fixed royalty bidding or fixed bonus-variable royalty bidding.[31] Other bidding options were added to the list, though authorizing regulations for those systems must be promulgated in advance of their use.

But Congress did not stop there. The Secretary's discretion in choosing among alternative bidding systems was limited in one crucial respect. Elsewhere in that section, at § 8(a)(5)(B), Congress mandated that cash bonus-fixed royalty bidding be utilized in a large percentage of leases. According to the express terms of the provision:

The bidding systems [other than cash bonus-fixed royalty bidding] shall be ap-plied to not less than 20 per centum and not more than 60 per centum of the total area offered for leasing each year during the five-year period beginning on [the date of the enactment of this section].[32]

Stated differently, Congress affirmatively intended that subsequent to passage of the amendments, cash bonus-fixed royalty bidding was to be used in at least 40% of all leases each year for five years. The only limitation put on use of this option was that it should not be used for more than 80% of the leases.

The legislative reports accompanying the amendments also reveal Congress's intent to preserve the cash bonus-fixed royalty bidding option. Congress sought experimentation among bidding systems, usually through direct comparisons between cash bonus-fixed royalty bidding and other options, in order to obtain reliable information as to the relative advantages and disadvantages of the enumerated systems. It was hoped that this testing would ultimately enable the Secretary to utilize the system or mix of options which emerged as superior. The House conference report notes:

Although there is no requirement for random selection, the Secretary, in setting forth systems for use on tracts, shall seek to secure a fair selection of different methods on different tracts. The purpose of such a selection is to assure that adequate information is obtained as to relative advantages and disadvantages of the various bidding systems, including the front-end bonus bid systems, as applied to different types of tracts.[33]

The lease sales under attack in this case independently and taken together fall well within the percentages required by § 8(a)(5)(B). One-half of the tracts to be leased in Lease Sale 48 were offered on a

---

**30.** The government does not deny the basic thrust of this assertion which had its root in a June 4, 1979 report of the General Accounting Office entitled, "Federal Leasing Policy—Is the Split Responsibility Working?" The full report appears at J.A. 154–72.

**31.** 43 U.S.C.A. § 1337(a)(1) (West Supp. 1979) (emphasis added).

**32.** 43 U.S.C.A. § 1337(a)(4)(B) (West Supp. 1979).

**33.** H.R.Rep.No.95–1474, 95th Cong., 2nd Sess. 92 (1978), U.S.Code Cong. & Admin.News 1978, pp. 1674, 1691. *See also* H.R.Rep.No.95–590, 95th Cong., 1st Sess. 54 (1977); S.Rep.No. 95–284, 95th Cong., 1st Sess. 47 (1977).

cash bonus-fixed royalty basis, with the other half solicited on a cash bonus-sliding scale royalty basis. In the public notice announcing Sale 48, the Secretary stated that the bidding plans were designed to facilitate a "valid statistical analysis." [34] Similarly, the announcement for Lease Sale 48, held on July 30, 1979, noted that both systems would again be employed for experimental purposes.[35]

The foregoing makes plain enough Congress's intention that cash bonus-fixed royalty bidding be used widely, and in conjunction with use of other systems. The amendments and legislative reports are replete with other indicia demonstrating that Congress contemplated its continued use as well as delays in the implementation of alternative systems. The statute requires that regulations implementing the new systems be promulgated in advance of their use. Toward that end, the Secretary of Energy is required to consult with the Interior Secretary.[36] Just this year, the House Committee noted with disapproval that the new regulations could take up to two years to issue.[37] Even the June 1979 GAO report, which appellants use to document their claim of the Energy-Interior jurisdictional battles, recommends that regulations covering alternative bidding systems be issued "no later than January 1, 1981." [38] We are informed that proposed regulations governing three bidding options—the two systems previously authorized under the original OCS Act and cash bonus-sliding scale royalty bidding which had been employed on an experimental basis—were issued on July 26, 1979.[39] Regulations governing bidding under a profit-sharing system, the option most heavily favored by appellants, must precede notice of a sale by 90 days.[40] Although when pressed at oral argument appellees could not promise a date by which profit-sharing regulations will emerge, they have given repeated assurances that the regulations have been returned to the Department of Energy from Interior and should be out "in the near future."

The legislative scheme also contains an elaborate system of interdepartmental consultation and intergovernmental coordination for various purposes. For example, the Attorney General, in consultation with the Federal Trade Commission, is accorded a 30-day period in which to review the competitive effects of bids under each lease sale.[41] The section on bidding systems in the annual report on leasing and production is also to be prepared in consultation with the Attorney General.

That Congress was aware of potential delays in implementing the amendments appears from Section 18 of the OCS Act, added in 1978.[42] Section 18 mandates the preparation of a comprehensive oil and gas leasing program in accordance with the policies of the OCS Act. Congress gave the Secretary nine months from the date of enacting the amendments to prepare the plan before submitting it to Congress, the Attorney General, and the governors of states affected by lease sales.[43] In addition, the Secretary must allow 90 days for receiving comments on the plan, and must submit the program and comments to Congress and

---

34. 44 Fed.Reg. 30,779 (May 29, 1979).

35. 44 Fed.Reg. 37,993 (June 30, 1979).
   In the first two lease sales of 1979, systems other than cash bonus-fixed royalty bidding were used in 37% of the total acreage offered. J.A. 238.

36. 43 U.S.C.A. § 1337(a) (West Supp. 1979); see note 10, supra.

37. See H.R.Rep.No.95–1835, 95th Cong., 2nd Sess. 25 (1979).

38. J.A. 171 (emphasis added). The Comptroller General went on to note that "once Energy's regulations are finalized on January 1, 1981," the Secretary of the Interior should "issue by March 1, 1981, Interior's own regulations which are consistent with Energy's." J.A. 171–72.

39. Govt.Br. at 22.

40. 43 U.S.C.A. § 1337(a)(6) (West Supp. 1979).

41. Id. at § 1337(c).

42. Id. at § 1344.

43. Id. at § 1344(c)(3). It is our understanding that the Secretary's plan was timely filed in April 1979.

the President 60 days before approving it.[44] More important, Congress made it clear that leasing was to continue until the comprehensive leasing program became operational. Section 18(d)(3) expressly provides:

> After the leasing program has been approved by the Secretary, or after eighteen months following September 18, 1978, whichever first occurs, no lease shall be issued unless it is for an area included in the approved leasing program and unless it contains provisions consistent with the approved leasing program, except that *leasing shall be permitted to continue until such program is approved and for so long thereafter as such program is under judicial or administrative review pursuant to the provisions of this subchapter.*[45]

The House report reiterated the clear meaning of that subsection:

> [T]he committee also realized that to prepare a program in conformity with this Act might take up to 18 months, and that leasing should continue during this time. There is intended to be no delay or interruptions in lease sales. During the period of time that the proposed leasing program is being considered and determined, leasing is to continue as heretofore . . . . If the approved leasing program is under judicial challenge, leasing can continue until judicial review is complete.[46]

Thus, Congress did not expect changes to take place overnight. To the contrary, it fully anticipated that an optimal comprehensive leasing plan took time—as much as 18 months or longer—to become operational. Accordingly, it drafted a detailed schedule for instituting the program, placing outside time limits on the completion of each stage. With these thoughts in mind it is difficult to find a legislative mandate to support appellants' forthright contention that the continued use of the cash bonus-fixed royalty system and delay in issuing profit-sharing regulations are inconsistent with the 1978 amendments.

Appellants base their case on the "unless clause" of subsection 8(a)(5)(B). That subsection mandates the use of bidding systems other than cash bonus-fixed royalty bidding for 20–60% of all leasing "unless the Secretary determines that the requirements set forth in this subparagraph are inconsistent with the purposes and policies of this subchapter."[47] Appellants interpret this clause to permit the Secretary to use systems other than cash bonus-fixed royalty bidding, such as profit-sharing, in *all* lease sales. Appellees, on the other hand, maintain that this subsection enables the Secretary to use cash bonus-fixed royalty bidding in all leasing. The legislative reports contain conflicting signals. Both earlier reports supported the government's reading of the clause. The Senate report, for example, saw the clause as an "escape-hatch" to compliance with the mandate to use other systems, in recognition of the fact that "there could be administrative problems involved in implementing new concepts and procedures."[48] Both houses expressed concern that compliance with the percentage limits might unduly retard OCS development.

The conference report, however, supports appellants' view. Though it retains a hint that the clause was designed to permit full use of cash bonus-fixed royalty bidding,[49]

---

44. *Id.* at § 1344(d)(1), (2).

45. *Id.* at § 1344(d)(3).

46. H.R.Rep.No.95–590, 95th Cong., 1st Sess. 151 (1977), U.S.Code Cong. & Admin.News 1978, p. 1557. *See also id.* at 48 ("While a new leasing program is being prepared and promulgated, leasing activities are to continue."): S.Rep.No.95–284, 95th Cong., 1st Sess. 76–77 (1977).

47. 43 U.S.C.A. § 1337(a)(5)(B) (West Supp. 1979).

48. S.Rep.No.95–284, 95th Cong., 1st Sess. 73 (1977). *See also* H.R.Rep.No.95–590, 95th Cong., 1st Sess. 139 (1977), U.S.Code Cong. & Admin.News 1978, p. 1545.

49. The report discusses a requirement in the statute that the Secretary explain "why the bonus bid system was used or is to be used in *more than* 60 per cent of the areas actually leased," without reference to the situation in which cash bonus bidding would be used in less than 40% of tracts bid. H.R.Rep.No.95–1474, 95th Cong., 2nd Sess. 93 (1978), U.S.Code

the report states directly that the percentage limits could be waived in *either* direction:

> The Secretary of the Interior is given the discretion to waive the *minimum or maximum* requirement for the use of bidding systems other than bonus bidding, based on a determination that *either* the minimum or maximum percentage level is not consistent with the purposes and policies of the act.[50]

■ Assuming, as we do, that subsection 8(a)(5)(B) sets limits which can be waived in either direction in appropriate cases, by the Secretary within his discretion, appellants argue next that this discretion has been abused. It is appellants' position that § 8(a)(5)(B) is qualified—and thus the Secretary's discretion is constrained—by the mandatory requirement of § 18(a)(4) that the leasing program be prepared and maintained in a manner consistent with the principle that:

> Leasing activities shall be conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government.[51]

■ As was virtually conceded by appellants at oral argument, the fair market value requirement of § 18(a)(4), appearing in the new section dealing with the comprehensive five-year leasing program, does not come into play until the comprehensive leasing program is ultimately approved.[52] It is our understanding that the Secretary's program applies to lease sales commencing in March 1980 and does not affect those under challenge in the present suit. In the meantime, the appropriate standard appears to be that leases must insure a "fair and equitable return." [53]

■ We need not explore the difference, if any, between these two standards. Nor need we decide which of the two is currently operative. For we cannot find on the basis of the record before us that the lease sales involved in this case violate either formulation. For this reason, we cannot conclude that the district judge abused his discretion when he determined that appellants "failed to show that utilization of the cash bonus-fixed bidding system with a 16⅔% fixed royalty violates the purposes underlying the Act." [54]

■ The trial judge relied on evidence offered by the government which sought to prove that the contested lease sales complied with the OCS Act. Although contrary evidence was introduced by appellants, there was a basis for believing that a 16⅔% royalty was warranted on these particular leases of "frontier" OCS lands.[55] The risk and uncertainties inherent in leasing these remote, unproven properties all but nullifies the impact of appellants' comparisons of these sales to those held by California or foreign governments. We recognize further that it is for the agency to weigh the evidence initially and we must restrain from interfering with a rational agency determination which is supported by substantial evidence.[56]

The district court ruling is fortified by additional factors. As the trial court noted, the public interest is protected by various Congressional oversight mechanisms incorporated into the OCS Act. Yet rather than express displeasure with the post-amendments administration of the leasing pro-

---

Cong. & Admin.News 1978, p. 1692 (conference report) (emphasis added).

**50.** *Id.*

**51.** 43 U.S.C.A. § 1344(a)(4) (West Supp. 1979). Appellants also argued that the Secretary's discretion was checked by provisions concerning the pro-competitive purposes of the amendments, see note 28 *supra.*

**52.** Not surprisingly the conference report discusses the fair market value concern only in connection with its analysis of § 18.

**53.** 43 U.S.C.A. § 1802(2)(c) (West Supp.1979).

**54.** J.A. 294.

**55.** *See* H.R.Rep.No.95–590, 95th Cong., 1st Sess. 94 (1977).

**56.** *See County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1383 (2nd Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1064, 55 L.Ed.2d 764 (1978).

gram, Congress recently merely took note of the schedule for implementing leasing regulations in the years ahead.[57] This observation reinforces our conclusion expressed earlier that Congress plainly intended leasing to continue in the interim. Significantly, although several major developments coalesced to warrant the massive overhaul of the OCS Act in 1978, conditions have changed relatively little since passage of the amendments. We see no occasion yet to say that the Secretary was under a duty to use the "escape hatch" in order to deviate from the basic plan laid out in the amended Act.

We also cannot be oblivious to the many often conflicting policies and purposes underlying the OCS Act amendments. Though the attainment of competition and fair market value were of undoubted concern to the legislators, their primary interests lay in insuring expeditious oil and gas development in a manner consistent with environmental protection.[58] It should come as no surprise that a scheme which mandates experimentation among alternative systems should on occasion fall short of perfection in achieving some legislative goals.[59]

Thus far, the district court has only denied a preliminary injunction. At a trial on the merits, the district court is free to consider the case in the light of intervening developments. It can reconsider all matters raised in the motion for preliminary injunctive relief. It may also explore several matters not previously before it. For example, it could examine the Secretary's reasons for using cash bonus-fixed royalty bidding on as much as 50% of the tracts bid, rather than on some lesser basis still falling within the statutory guidelines. Or it

might consider more directly than it had occasion to previously whether the 16⅔% royalty fixed by the Secretary for cash bonus bidding is unduly low. Lastly, at some point in time the Secretary's delay in issuing profit-sharing regulations and in failing to experiment among alternative bidding systems more widely may constitute a violation of the OCS Act amendments. We can not say on this record that the government's actions to date have run afoul of the legislative scheme.

In view of the Secretary's endeavor, and the national interest, to expedite exploration under leases we think it appropriate to observe that although technically the district court has latitude to retroactively remedy those sales already concluded (should it reverse its earlier inclination), on the facts before us it is unlikely that such a course would constitute a sound exercise of judicial discretion. The district court would be required to balance the harm to appellants against that suffered by the government and the successful bidders in the completed lease sales. If the Secretary is forced to reschedule completed sales the attendant disruption of OCS development would surely disserve priorities set by Congress. All previously successful bidders would find wasted the enormous outlays of capital they invested in prior bidding, and all would be disadvantaged by the public disclosure of their original bids. Furthermore, the government, and derivatively the public, would be injured by this prior disclosure, thereby destroying the essence of secret bidding procedures.

*Affirmed.*

WALD, Circuit Judge, concurring:

I concur in Judge Leventhal's opinion but write separately to underscore a few points

---

**57.** H.R.Rep.No.95–1835, 95th Cong., 2nd Sess. 25 (1979).

**58.** *See* H.R.Rep.No.95–590, 95th Cong., 1st Sess. 53 (1977), U.S.Code Cong. & Admin.News 1978, p. 1460 ("The basic purpose of [the OCS Act amendments] is to promote the swift, orderly and efficient exploitation of our almost untapped domestic oil and gas resources in the Outer Continental Shelf."); S.Rep.No.95–284, 95th Cong., 1st Sess. 42–43 (1977).

**59.** In discussing the procedures for utilizing the various bidding systems, the Senate report conceded:

These alternatives may not be the "perfect solution." However, they . . . are certainly worth trying on an experimental basis. S.Rep.No.95–284, 95th Cong., 1st Sess. 47 (1977).

of extreme importance in this case, which may be considered in the course of any trial on the merits.

The 1978 amendments to the Outer Continental Shelf Lands Act aimed at comprehensive reform of traditional oil leasing practices of the United States. The legislators were motivated to act by their concern that the nearly exclusive use of the traditional cash bonus-fixed royalty bidding system was not operating in the best interest of the public. They fixed three goals in the new Act relevant here, goals which in practice might conflict but which they expected to be accommodated by the Secretary of Interior's discretion; a system of leasing which would provide fast, efficient exploitation of our energy resources, a fair market value return for the people of the United States, and improved competition among the lessees. The Act clearly envisioned *prompt* experimentation with a variety of methods of leasing to see which would best operate in practice to meet all three goals. 43 U.S.C. § 1337(a)(1). A few of these methods had been tried sporadically under the old Act. Others, primarily the profit sharing option, showed promise but had never been tried by the United States. The statute specifically required the Secretary of the Interior to develop and submit to Congress a comprehensive 5-year leasing program within nine months after the Act became effective, 43 U.S.C. § 1344(c)(3), and it is a fair inference that Congress intended he should be able to pick and choose between the various leasing methods authorized in the new Act as soon as possible after the plan was approved in order to "assure receipt of fair market value for the lands leased." § 1344(a)(4). In the course of this experimentation, considerable discretion would be necessarily vested in the Secretary to balance a variety of goals and policies. But by the very terms of the Act no meaningful experimentation can begin until the regulations under which the new leasing methods will operate have been promulgated. Defendants' immediate responsibility is

to promulgate the necessary regulations as rapidly as possible in order to implement Congress' reform goals.*

An important trust has been given to the defendants here, since through inordinate delay the entire purpose of the Act could be frustrated and in the meantime, according to disturbing estimates submitted by the plaintiffs, the government and ultimately the taxpayers may be losing hundreds of millions of dollars in future revenues with each sale. There are also troublesome indications in this record that the delay which has already occurred is due not only to the complexity of the defendants' task in promulgating new regulations, but to a jurisdictional squabble between agencies over control of the process of leasing our offshore oil and gas fields.

The majority opinion, in which I concur, concludes that at this time and in this posture of the case, the Secretary of Interior has not contravened "the letter of the law." Nevertheless, the time may be approaching when the Secretary, by continuing to grant leases without utilization of the panoply of experimental bidding systems authorized by the Act, is frustrating the essential experimental purpose of the Act and thus abusing the discretion which has been granted him. At this point, on this record, the delay is not clearly unreasonable, but the more sales of leases which are held without promulgation of the new regulations which are necessary before the congressionally-mandated program of reform can get underway, the more unreasonable the delay appears. As the Court's opinion points out in its concluding paragraph, leases once submitted for bids, much less granted, are virtually impossible to withdraw, no matter how detrimental to the public interest they turn out to be. Certainly these new bidding procedures are complicated, but our energy program is a matter of the highest priority, and the new Act was passed well over a year ago.

* On December 6, 1979, just prior to issuance of this opinion, a notice of proposed rulemaking was published, inviting comment and announcing hearings on regulations to cover one new bidding method: cash bonus bidding—fixed net profit sharing. 44 Fed.Reg. 70,390 (1979).