ENERGY ACTION EDUCATIONAL
FOUNDATION, et al., Appellants,

v.

Cecil D. ANDRUS, Secretary of
the Interior, et al.

No. 80–2127.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 26, 1980.

Decided Oct. 30, 1980.

John Silard, Washington, D. C., with whom Joseph L. Rauh, Jr., Jonathan D. Schiller and H. Bartow Farr, III, Washington, D. C., were on the brief for appellants.

Edward J. Shawaker, Atty., Dept. of Justice, Washington, D. C., with whom Sanford Sagalkin, Acting Asst. Atty. Gen., Peter R. Steenland, Jr., Bruce C. Rashkow and Anne S. Almy, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

E. Edward Bruce, Washington, D. C., with whom Mark D. Nozette and Constance J. Chatwood, Washington, D. C., were on the brief for amicus curiae urging the appeal be dismissed and the order affirmed.

Before ROBINSON and WALD, Circuit Judges; and HAROLD GREENE *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

## I. INTRODUCTION

For a second time in this case we are asked to determine whether the bidding systems employed by the Secretary of the Interior in leasing government offshore properties for oil and natural gas development comply with the Outer Continental Shelf Lands Act as substantially amended in 1978 ("OCSLA" or "the Act").[1] In an earlier decision this court found that the bidding systems utilized by the Secretary at that time did not contravene "the letter of

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. 43 U.S.C. 1331 et seq. (citations are to current version of the code unless otherwise indicated).

the law."[2] We noted, however, that the time might come when the Secretary's continued failure to use the panoply of experimental bidding systems authorized by the Act would amount to an abuse of discretion.[3] Now we decide that, given the absence of significant progress toward experimenting with critical alternatives to front end cash bonus bidding systems since our prior decision, the day has arrived when the Secretary's continued delay is unreasonable and frustrates the essential purposes of OCSLA.

The present appeal challenges the district court's denial of appellants' motion for partial summary judgment, and in the alternative, motion for a preliminary injunction. Having heard argument on the appeal on an expedited basis, as required by statute,[4] this court affirmed the district court's refusal to enjoin the three lease sales scheduled for the fall of 1980 in an order dated September 29, 1980.[5] This opinion addresses the remaining aspects of the appeal not disposed of by the September 29, 1980 order.

## II. BACKGROUND

We revisit a controversy initially ruled upon by this court almost a year ago. The parties now before the court are the same as they were then: Plaintiff-Appellants are seven consumer and two labor organizations, three private citizen-taxpayers, and two California governmental entities.[6] The Defendant-Appellees are the Secretaries of the Interior and Energy, and the United States. Appellants' complaint, filed over a year ago, claimed that the Secretary of Energy failed to issue regulations for all the bidding systems set out in OCSLA, and that the sale of Outer Continental Shelf ("OCS") leases in the absence of those regulations violated OCSLA.[7] Appellants also

2. *Energy Action Educational Foundation v. Andrus*, 631 F.2d 751 (D.C.Cir., 1979).

3. *Id.* at 761; conc. op. at 762.

4. 43 U.S.C. § 1349(d).

5. Lease sales were scheduled for September 30, October 21, and an unspecified date in November, 1980. While we upheld the district court's refusal to enjoin these three imminent sales, we conclude for reasons discussed more fully below, that injunctive relief may not be inappropriate with respect to later sales. With the continued passage of time since the enactment of the 1978 OCSLA Amendments the appraisal will vary of appellants' likelihood of success on the merits, their irreparable injury, the balance of equities and the public interest. *Washington Metropolitan Area Transit Comm. v. Holiday Tours*, 559 F.2d 841, 843 (D.C.Cir.1977). These tests for injunctive relief increasingly tip in appellants' favor, as the number of sales that have been held without experimentation with OCSLA non-cash bonus bidding alternatives grows. In addition, since the currently scheduled future sales are several months hence, pre-sale preparations will be less finalized at this time so that requiring implementation of the alternative bidding systems before future sales take place should be more feasible and less disruptive than in the case of the three sales scheduled for the fall of 1980.

6. The fourteen appellants are: Energy Action Educational Foundation; Consumer Federation of America; Consumer Energy Council of America; Michigan Citizens Lobby; Arkansas Consumer Research, Inc.; Service Employees International Union; International Association of Machinists; Citizen/Labor Energy Coalition; Texas Consumer Association; M. James Doling; Paul Casagrande; Kathleen F. O'Reilly; California State Lands Commission; and the City of Long Beach, California.

7. Complaint, ¶¶ 133–143, J.A. 1, 73–76. ("J.A. —" refers to pages in the Joint Appendix prepared for the first appeal of this case in Nos. 79–1768 and 79–1787.)

Section 8(a)(1) of OCSLA, 43 U.S.C. § 1337(a)(1), sets out the permissible alternative bidding systems and reads as follows:

(a)(1) The Secretary is authorized to grant to the highest responsible qualified bidder or bidders by competitive bidding, under regulations promulgated in advance, any oil and gas lease on submerged lands of the outer Continental Shelf which are not covered by leases meeting the requirements of subsection (a) of section 1335 of this title. Such regulations may provide for the deposit of cash bids in an interest-bearing account until the Secretary announces his decision on whether to accept the bids, with the interest earned thereon to be paid to the Treasury as to bids that are accepted and to the unsuccessful bidders as to bids that are rejected. The bidding shall be by sealed bid and, at the discretion of the Secretary, on the basis of—

(A) cash bonus bid with a royalty at not less than 12½ per centum fixed by the Secretary in amount or value of the production saved, removed, or sold;

claimed that the Secretary of Interior's use of the cash bonus-fixed royalty bidding system, both before and after the 1978 Amendments to OCSLA, amounts to an abuse of discretion.[8]

The case first came before this court upon appellants' challenge to the district court's two orders denying appellants' motions for preliminary injunctive relief to stop further lease sales. In an opinion authored by the late Judge Leventhal this court affirmed the district court's rulings.

Judge Leventhal's analysis began with a review of the history of the federal statutes enacted to provide for the development of offshore land on the "Outer Continental Shelf."[9] A reprise of this legislative background is appropriate before analyzing our prior opinion.

## The 1978 OCSLA Amendments

OCSLA, originally enacted in 1953, was the first federal statute to regulate the development of OCS oil and gas resources.[10] Since that time the federal government has been actively engaged in leasing OCS lands.[11] Before its amendment in 1978 the Act specified two alternative formats for lease bidding. The Secretary was directed to conduct competitive bidding by sealed bids either (1) on the basis of a cash bonus bid with a fixed royalty (fixed at no less than 12½ percent of the gross revenue of the lease), or (2) by a royalty rate bid with a fixed cash bonus payment.[12] Prior to 1978 virtually all of the OCS lease sales were transacted by the cash bonus-fixed royalty method with the royalty set in advance of bidding at 16⅔ percent (one-sixth) of the gross value of production.[13] Under that

(B) variable royalty bid based on a per centum in amount or value of the production saved, removed, or sold, with either a fixed work commitment based on dollar amount for exploration or a fixed cash bonus as determined by the Secretary, or both;

(C) cash bonus bid, or work commitment bid based on a dollar amount for exploration with a fixed cash bonus, and a diminishing or sliding royalty based on such formulae as the Secretary shall determine as equitable to encourage continued production from the lease area as resources diminish, but not less than 12½ per centum at the beginning of the lease period in amount or value of the production saved, removed, or sold;

(D) cash bonus bid with a fixed share of the net profits of no less than 30 per centum to be derived from the production of oil and gas from the lease area;

(E) fixed cash bonus with the net profit share reserved as the bid variable;

(F) cash bonus bid with a royalty at no less than 12½ per centum fixed by the Secretary in amount or value of the production saved, removed, or sold and a fixed per centum share of net profits of no less than 30 per centum to be derived from the production of oil and gas from the lease area;

(G) work commitment bid based on a dollar amount for exploration with a fixed cash bonus and a fixed royalty in amount or value of the production saved, removed, or sold; or

(H) subject to the requirements of paragraph (4) of this subsection, any modification of bidding systems authorized in subparagraphs (A) through (G), or any other systems of bid variables, terms, and conditions which the Secretary determines to be useful to accomplish the purposes and policies of this subchapter, except that no such bidding system or modification shall have more than one bid variable.

8. Complaint, ¶¶ 144–158, J.A. 1, 77–83 (contending *inter alia* that cash bonus bidding did not yield fair market value). *See* p. 741 *infra.*

9. The term "Outer Continental Shelf" has been defined by Congress to include all submerged lands lying seaward and three miles outside State waters, "and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." 43 U.S.C. § 1331(a).

10. 67 Stat. 462, 43 U.S.C. § 1331 *et seq.*

11. As of the date the present appeal was argued, 52 sales of oil and gas leases have taken place on the OCS, resulting in the issuance of 3701 leases. Those leases currently yield nine percent of domestic oil production and 24 percent of domestic gas production. After our order of September 29, 1980 a sale occurred on September 30, 1980; two more sales are scheduled for the remainder of 1980.

12. 43 U.S.C. § 1337(a) (1976).

13. There were, however, sales conducted by other methods. Some tracts were offered for lease sales on the basis of royalty bidding with a fixed cash bonus at OCS lease sales 36 (Santa Barbara Channel) and CI (Cook Inlet, Alaska) held on October 16, 1974 and October 27, 1977, respectively. At those two sales a total of 56 tracts were offered with royalty bidding and 38 received bids.

system, a lease would be awarded to the qualified bidder with the highest cash bid deemed acceptable to the Secretary on a particular tract.

With the exception of one minor amendment,[14] the original version of OCSLA remained untouched until 1978.[15] By the mid-1970's, however, several cross-currents generated support for revising OCSLA.[16] The onset of the energy crisis, dramatized by the oil embargo of 1973, heightened the attractiveness of the uncertain OCS re-

sources to those concerned with reducing this country's dependence on foreign oil supplies.[17] At the same time, local governments, environmental and citizen organizations, commercial and recreational fishing interests, and other groups expressed increasing concern over possible deleterious effects of rapid OCS development. They sought a greater voice in developing and regulating future OCS ventures.[18]

Some of these interest groups focused attention on the inadequacies of the exist-

At nine sales in 1978 and 1979 some tracts were offered on the basis of bonus bidding with fixed sliding scale royalty. Under that system the Secretary initially sets a royalty schedule under which the lessee is required to pay a percentage which increases to as much as 60 percent as the value of production increases. The leases are awarded to the bidders which submit the highest acceptable cash bid for a particular tract. Brief for Appellants at 4, *Energy Action Educational Foundation v. Andrus*, No. 80–2127 (D.C.Cir., argued Sept. 26, 1980) [hereinafter "Brief for Appellants"].

In lease sale No. 35 off the coast of Southern California in December, 1975, tracts were offered under a cash bonus system with fixed royalty doubled from the traditional 16⅔ percent to 33⅓ percent. H.R.Rep. No. 1835, 95th Cong., 2d Sess. 14–15 (1979). For a description of post-1978 bidding *see* pp. 740–41, 743–44, *infra*.

**14.** The Deepwater Port Act, January 3, 1975, Public Law 93–627, Sec. 19(f), 88 Stat. 2146, required the State laws applicable to OCS activities to be continually updated. *See* 43 U.S.C. § 1333, as amended (1976).

**15.** Other statutes that affected OCS operations were passed during that period:

Fish and Wildlife Act of 1956 (Act of August 8, 1956, 70 Stat. 1119 as amended, 16 U.S.C. §§ 742a *et seq.*)—Establishes the U. S. Fish and Wildlife Service to study, protect and manage the fish resources under U. S. jurisdiction.

. Geneva Conventions of 1958 (Convention on the Territorial Sea and the Contiguous Zone. U. N. Doc. A/Conf. 13/L.52 T. I. A. S. 5639; Convention on the Continental Shelf, U. N. Doc. A/Conf. 13/L.55 T. I. A. S. 5578.) —Provides for a territorial sea of 3 miles, a contiguous zone up to 12 miles, and a continental shelf "to a depth of 200 meters or . . . to where the depth . . . admits to exploration . . ."

Natural Gas Pipeline Safety Act of 1968 (Public Law 90–481, 82 Stat. 720, 49 U.S.C. §§ 1671 *et seq.*)—Establishes requirements for the placing of pipelines.

National Environmental Policy Act of 1969 (Public Law 91–190, 83 Stat. 852, 42 U.S.C. §§ 4321 *et seq.*)—Provides requirements through regulations for draft environmental impact statements, hearings, and final environmental impact statements as to areas of leasing and actual leases.

Occupational Safety and Health Act of 1970 (Public Law 91–596, 84 Stat. 1590, 29 U.S.C. §§ 651 *et seq.*)—Requires employers, including those engaged in OCS development activities, to provide a safe working environment for all employees.

Federal Water Pollution Control Amendments of 1972 (Public Law 92–500, 86 Stat. 816, 33 U.S.C. §§ 1251 *et seq.*)—Limits and controls the discharge of oil or hazardous substances into or upon the navigable waters.

Marine Mammal Protection Act of 1972 (Public Law 92–522, 86 Stat. 1027–46, 16 U.S.C. §§ 1361, 1362, 1371–84, 1401–07.)—Authorizes the designation of marine sanctuaries which may extend to the outer limit of the Continental Shelf.

Coastal Zone Management Act of 1972 (Public Law 89–454, as added Public Law 92–583, 86 Stat. 1280, 16 U.S.C. §§ 1451 *et seq.*)—Provides Federal assistance to coastal States to enable them to develop and administer their own coastal management programs.

Deepwater Port Act of 1974 (Public Law 93–627, 88 Stat. 2126, 33 U.S.C. §§ 1501 *et seq.*)—Provides for the regulation of the location, ownership, construction, and operation of deepwater ports beyond the territorial limits of the United States.

**16.** *See generally* H.R.Rep.No.96–1214, 96th Cong., 2d Sess. 5–6 (1980); H.R.Rep.No.95–590, 95th Cong., 1st Sess. 74–94 (1977).

**17.** *Id.; see also* S.Rep.No.95–284, 95th Cong., 1st Sess. 60–68 (1977).

**18.** H.R.Rep.No.96–1214, *supra* note 16, at 5–6; H.R.Rep.No.95–1835, *supra* note 13, at 6–7; H.R.Rep.No.95–590, *supra* note 16, at 74–94.

ing bidding system specified by OCSLA. In light of skyrocketing fuel prices it was asserted that the prevalent cash bonus-fixed royalty method of bidding could not assure the government a fair return on its leases, because total royalties paid to the government were declining as a percentage of gross proceeds on wells. In addition, the necessity to make extremely high "front end" cash bonus payments in order to participate in the lease sales coupled with the high risk associated with developing some OCS lots had the anticompetitive effect of limiting participation in the lease sales to only the largest concerns.[19]

Congress responded to the competing concerns for acceleration of OCS development, environmental protection, and involvement of all interested parties in OCS development by enacting the OCSLA Amendments of 1978. With regard to lease sale bidding procedures, Congress expressly retained the two bidding systems previously authorized, but added five other specific alternatives as well as any nonenumerated bidding method the Secretary of the Interior determines to be useful to accomplish the purposes and policies of the Amendments.[20] The Secretary is required to use the enumerated alternatives to the cash bonus-fixed royalty method for not less than 20 percent but not more than 60 percent of all acreage offered for leasing each year during a five year experimentation period specified by the statute.[21] In addition, although the Act provides that lease sales are to be conducted by the Secretary of the Interior, it is the Secretary of Energy who, in consultation with the Secretary of the Interior, must promulgate regulations governing the use of alternative authorized bidding options.[22] The Secretary of Energy must report to Congress annually concerning the use and nonuse of the alternative bidding options.[23] The Secretary of the Interior must also evaluate the competitive impacts of the use and nonuse of bidding options in an annual report to Congress, as well as reporting before each lease sale of the planned use of particular bidding systems.[24] Finally, the Secretary of the Interior is required to prepare and maintain a comprehensive oil and gas leasing program to implement the different policies of the Act.[25] That program must adhere to general principles spelled out in the statute, including a balanced consideration of economic, social, and environmental concerns and the assurance of a fair market value on leased land to the government.[26]

*This Court's Prior Decision*

Three OCS lease sales were held between the September 18, 1978 effective date of the OCSLA Amendments and the June 22, 1979 filing date of appellants' lawsuit. In each instance the Secretary of the Interior chose cash bonus-fixed royalty bidding for part of the tracts to be leased, while using another bidding system—a cash bonus system with

19. H.R.Rep.No.96–1214, *supra* note 16, at 14; H.R.Rep.No.95–590, *supra* note 16, at 54, 94, 103; S.Rep.No.95–284, *supra* note 17, at 46–47.

20. 43 U.S.C. § 1337(a)(1). *See* text of alternative bidding provisions, note 7 *supra*.

21. 43 U.S.C. §§ 1337(a)(1), (a)(5)(B). The five year period began on September 18, 1978. The percentage limitations apply "unless the Secretary determines that the [percentages] are inconsistent with the purposes and policies of the Amendments." 42 U.S.C. § 1337(a)(5)(B). This last provision is referred to as an "escape hatch" in S.Rep.No.95–284, *supra* note 17, at 73; H.R.Rep.No.95–590, *supra* note 16, at 139.

22. Under Section 302(b)(2) of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. §§ 7101 *et seq.*, the responsibility of the Secretary of the Interior to promulgate regulations implementing OCS alternative bidding systems was transferred to the Secretary of Energy. 42 U.S.C. § 7152(b)(2). *See* H.R.Rep. No. 95–1474, 95th Cong., 2d Sess. 77–78, 90 (1978) (Conference Report). If the Energy Secretary wishes to promulgate regulations for systems which are not described in Section 8(a)(1)(A)–(G) but instead proceeds under Section 8(a)(1)(H) (*see* note 7 *supra*) he must report the proposed system to Congress. The new system may not be used if either House passes a resolution of disapproval within 30 days. Section 8(a)(4), 43 U.S.C. § 1337(a)(4).

23. 43 U.S.C. § 1337(a)(9).

24. *Id.* §§ 1337(a)(8), 1343(2).

25. *Id.* § 1344.

26. *Id.* § 1344(a)(1).

a fixed non-linear (semi-logarithmic) sliding scale royalty[27]—for the other tracts. The Secretary planned to use the same mix of bidding systems in four more lease sales that were scheduled to occur between June and November, 1979.

Appellants' suit challenged the Secretary of the Interior's continued use of the cash bonus-fixed royalty bidding system. Judge Leventhal described the thrust of the litigation:

> The essence of appellant's complaint is that cash bonus-fixed royalty bidding, particularly with the royalty fixed at 16⅔%, cannot yield fair market value nor generate adequate competition as mandated by the amended OCS Act. Only through the issuance and use of regulations authorizing alternative systems, most notably the profit-sharing options, can the government achieve the statutory objectives. However, according to appellant, issuance of those regulations has been unduly delayed by a "jurisdictional squabble" between the Departments of Energy and the Interior.[28]

Appellants sought declaratory and injunctive relief leading to the suspension of all OCS leasing until the Secretary of Energy promulgated regulations governing the use of all of the alternative bidding systems authorized by OCSLA. In particular, appellants' objective was the promulgation of regulations for bidding incorporating net profit sharing. Appellants also sought an injunction against any further leasing under the cash bonus-fixed (16⅔ percent) royalty method as well as an investigation of existing leases with appropriate remedial action if it were demonstrated that the then existing leases would not return a fair yield to the government.

Before the first of the four planned 1979 lease sales appellants moved for a preliminary injunction to prevent any further sales "in the absence of regulations establishing the full range of bid systems mandated by [OCSLA]." The district court denied the motion ruling that appellants had failed to show a likelihood of success in prevailing on the merits.[29] Appellants did not appeal this ruling, but rather, moved for modification of the order so as to enjoin the award of leases in the first scheduled sale on the basis of cash bonus-fixed royalty bidding. After bids were opened for the June, 1979 sale, appellants renewed their motion for a modification, arguing that the actual bidding results contravened the Act. This motion was denied by the district court on the basis that appellants had "still failed to show that utilization of the cash bonus-fixed bidding system with a 16⅔ percent fixed royalty violates" OCSLA.[30]

On appeal this court refused to grant preliminary injunctive relief. In announcing this result the court carefully limited the scope of the issue decided to "whether the continued partial use of cash bonus-fixed royalty bidding—*as planned for the near future by the Secretary*—violates the statutory scheme."[31] (Emphasis supplied). On the basis of the record at that point in the litigation the court would not say that the government's leasing activities violated the legislative scheme.[32] The opinion emphasized that while Congress anticipated the continued "substantial" use of the traditional cash bonus-fixed royalty form of bidding, "Congress [also] sought experimentation among bidding systems, usually through direct comparisons between cash bonus-fixed royalty bidding and other options, in order to obtain reliable information as to the relative advantages and disadvan-

---

27. See note 13 *supra*.

28. *Energy Action Educational Foundation v. Andrus, supra* note 2 [hereinafter "Energy Action"], at 755.

29. *Energy Action Educational Foundation v. Andrus*, 479 F.Supp. 62 (D.D.C.1979); (order denying preliminary injunction per Robinson, District Judge, J.A. 293).

30. Civ.No. 79–1633 (D.D.C. July 17, 1979) (order denying motion for modification per Robinson, District Judge), J.A. 549.

31. *Energy Action*, at 757.

32. *Id.* at 760, 761.

tages of the enumerated systems. It was hoped that this testing would ultimately enable the Secretary to utilize the system or mix of options which emerged as superior." [33]

A reasonable timetable for achieving this mix of options was suggested in the opinion. Judge Leventhal referred to the House Committee Report's "disapproval" of the possibility that the new regulations would take up to two years to issue.[34] The opinion also noted a June 1979 GAO Report recommending that alternative bidding systems be issued "no later than January 1, 1980." Further, the opinion recognized that Congress had provided flexibility in scheduling deadlines for compliance with the 1978 Amendments. For example, the amended Act requires the preparation of a comprehensive five year oil and gas leasing program.[35] The Act provides that either after approval of that plan by the Secretary, or in any event no later than March, 1980 (eighteen months following the September, 1978 effective date of the 1978 Amendments), no leases were to be issued unless issued pursuant to the comprehensive plan. Nevertheless, Congress made it clear that leasing was to continue until the comprehensive leasing program became operational, both during the interim between enactment of the 1978 Amendments and the approval of the plan, and thereafter for so

long as the plan was under judicial or administrative review.[36] The opinion concluded:

> Congress did not expect changes to take place overnight. To the contrary, it fully anticipated that an optimal comprehensive leasing plan took time—*as much as 18 months or longer*—to become operational. Accordingly, it drafted a detailed schedule for instituting the program, placing outside time limits on the completion of each stage.[37]

(Emphasis supplied.)

At the same time the opinion did recognize that the Secretary's leeway on timing was not boundless:

> [A]t some point in time the Secretary's delay in issuing profit-sharing regulations and in failing to experiment among alternative bidding systems more widely may constitute a violation of the OSC Act amendments.[38]

It merits interjecting at this point that both at the time of our earlier opinion and subsequently, the government's intentions and actual progress toward meeting a reasonable timetable for issuance of profit sharing regulations has been a source of some confusion. For example, proposed regulations dealing with profit sharing were said to be forthcoming imminently at the time of argument in the earlier case.

---

**33.** *Id.* at 13. The opinion cited to the Conference Report's language requiring "a fair selection of different methods on different tracts." H.R.Rep. No. 95–1474, *supra* note 22, at 92. *See also* H.R.Rep. No. 95–590, *supra* note 16, at 54; S.Rep. No. 95–284, *supra* note 17, at 47.

The bidding methods utilized or planned at the time of the opinion are discussed at pp. 11–12 *supra*. None of the completed or planned sales utilized the variable net profit share method specified in 43 U.S.C. § 1337(a)(1)(E). The subsequent development and use of regulations is discussed at p. 743 *infra*.

**34.** *See* H.R.Rep. No. 95–1835, *supra* note 13, at 25.

**35.** 43 U.S.C. § 1344. The mandated comprehensive program had not been submitted at the time of the prior opinion, and was not ultimately submitted and approved until June, 1980.

**36.** *Id.* § 1344(d)(3).

**37.** *Energy Action*, at 759.

**38.** *Id.* at 761. The opinion also implied, without deciding, that under some circumstances the government's failure to invoke the so-called "escape hatch" (*see* note 21 *supra*) to exceed the maximum limitations on the use of alternatives to cash-bonus bidding could amount to an abuse of discretion. *Id.* at 20. Support for this position is found in the Conference Committee Report which states:

> The Secretary of the Interior is given the discretion to waive the *minimum* or *maximum* requirement for the use of bidding systems other than bonus bidding, based on a determination that *either* the minimum or maximum percentage level is not consistent with the purposes and policies of the act.

H.R.Rep. No. 95–1474, *supra* note 22, at 93 (*emphasis supplied*).

When issued in December, 1979 they dealt only with the cash bonus bidding-fixed net profit share option, option (D). But it is not at all clear whether the parties or even the court focused at the time of the earlier opinion on the fact that the forthcoming regulations were not to include variable net profit share bidding, option (E). It is also commonplace to find general references to net profit share bidding systems which do not distinguish between fixed and variable net profit options, in statements sprinkled throughout the legislative history and in the arguments of counsel and the prior opinion of this court,[39] as well as in appellees' reports to the Congress on its implementation plans as to OCSLA.[40] The fact is that neither then nor now have there ever been proposed or final regulations for *variable* net profit share bidding.[41]

*Subsequent Events*

Since this court's earlier decision, the Secretary of Energy has issued final regulations governing four of the seven alternative bidding schemes enumerated by OCS-LA.[42] All of these four regulations, however, had been under consideration at the time of our prior decision.[43] Only one of the regulations involves a non-front end cash bonus bidding system (royalty bid-fixed cash bonus, option (B) and there is also unrefuted evidence on the record that appellees have now determined not to make further use of this option.[44] Indeed, the Department of Energy reported to Congress on the basis of its leasing experience in 1978 that the disadvantages of royalty bidding "are too high a price to pay for the lower cash bonuses and higher bonus participation rates expected under royalty bidding."[45]

As regards the other three untested statutory bidding systems—two of which do involve non-front end cash bonus alternatives—there has been no significant progress in issuing regulations since the

---

**39.** *See, e. g., Energy Action,* at 756 n.29, which recites appellants' evidence offered to demonstrate the superiority of a profit-sharing bidding system over the cash bonus-fixed royalty option. Both the court's summary of the evidence, and the actual documents in the Joint Appendix refer to profit-sharing systems without specifying whether they mean *fixed* or *variable* systems.

**40.** *See, e. g.,* H.R.Rep.No.96–1214, *supra* note 16, at 49–50.

**41.** The Department of Energy has "contracted" for an analysis of a bidding system with net profit share as a bidding component. Brief for Appellees at 8. Apparently this is what the district court referred to in asserting that the Department of Energy was in the process of preparing variable net profit share regulations. Civ.No. 79–1633 (D.D.C. July 17, 1980) (memorandum opinion denying motion for preliminary injunction per Johnson, District Judge) [hereinafter "Mem. op."] at 7. *See* notes 47 & 50 *infra.*

**42.** Final regulations for bidding systems authorized by 43 U.S.C.A. § 1337(a)(1)(A)–(C) (cash bonus bid-fixed royalty, royalty bid-fixed cash bonus, and cash bonus bid-fixed sliding scale royalty) were promulgated on February 12, 1980, 45 Fed. Reg. 9536. Final regulations for a cash bonus bid-fixed net profit share bidding system were promulgated on May 30, 1980, 45 Fed. Reg. 36784.

**43.** The previous experience with the three methods described in § 1337(a)(1)(A)–(C) is described at pp. 737–738, 740–741 *supra.* The fourth method, cash bonus bid-fixed net profit, had been proposed by the time of our previous decision and was the option that appellees were referring to when they stated to both Congress and the courts that regulations governing profit-sharing would be out "in the near future." *See O.C.S. Oversight of 1978 Amendments; Hearings Before the Select Committee on the O.C.S., House of Representatives,* 96th Cong., 2d Sess. [hereinafter *"Oversight Hearings"*] 493–95 (Dec. 4, 1979) ("Hearings on Promulgation of Bidding Systems Regulation"), *summarized in* H.R.Rep.No.96–1214, *supra* note 16, at 49–50).

Appellants contend that even this fourth "new" method is not a real departure from past practice, but rather, is "once again the cash bonus bidding system advantaging the biggest oil companies." Brief for Appellants at 6.

**44.** Deposition of H. Theodore Heintz, Jr., Asst. Director of the Office of Policy Analysis, Department of the Interior, 334 (June 17, 1980), *Energy Action Educational Foundation v. Andrus,* No. 79–1633 (D.D.C.1980) (Deposition filed July 15, 1980, Docket No. 59) [hereinafter "Heintz Deposition"].

**45.** Department of Energy: *Report to Congress on Various Bidding Options Utilized in FY–78 Lease Sales on the OCS* 18, J.A. 232, 249.

prior decision of this court other than a preliminary "notice of inquiry" for comments on the development of work commitment bidding systems.[46] In particular, nothing has been done as to the critical variable net profit share bidding system; the record shows only a representation by appellants that a "contract for analysis" (content and completion date unknown) was let out in the summer of 1980.[47]

Meanwhile, the comprehensive five year leasing plan as mandated by section 18 of the Act[48] has been approved and thirty-six lease sales scheduled under its terms. Three such sales were scheduled for the end of 1980 and one of these occurred shortly after argument of the present appeal.[49] The next six sales are currently planned to be held in consecutive months beginning in May, 1981. If appellees continue on their course, it seems evident that 1981 will pass, and with it over one-half of the five year statutory period for experimenting with bidding alternatives and over one-third of the five year comprehensive leasing pro-

gram, with no experimentation with variable net profit share bidding. The prospects for expecting such experimentation are further dampened by appellees' refusal to recognize any statutory obligation to issue regulations on variable net profit share bidding by any specific time or indeed any time at all.[50]

## III. ANALYSIS

Before the trial court, both sides moved for summary judgment. Appellants sought partial summary judgment or, in the alternative, a preliminary injunction, on the grounds that the government was in violation of the Act because it still had not developed regulations for all of the bidding systems as required by OCSLA. In turn, the government appellees moved for summary judgment; first on the ground that the Act did not require promulgating all of the authorized regulations before further lease sales took place, and, second, on the ground that the continued use of cash bo-

**46.** The three untested bidding systems are those specified by 43 U.S.C. §§ 1337(a)(1)(E)–(G). The Department of Energy issued a notice of inquiry and requested comments on the development of bidding systems with a work commitment component authorized by 43 U.S.C. §§ 1337(a)(1)(B), (C) & (G) in a notice published July 25, 1980, 45 Fed.Reg. 49586.

**47.** In a deposition taken in June, 1980, an Interior Department official admitted that no proposal for regulating net variable profit share bidding was expected any time soon. Heintz Deposition, *supra* note 44, at 111 (June 16, 1980). At argument appellees admitted that no regulations on variable net profit share bidding would issue this year or in the immediate future. Indeed, appellees conceded that there was no timetable for their issuance at all.

This is consistent with appellees' position that OCSLA does not require the promulgation of any specific bidding system, and that there is no statutory duty to issue all the regulations by any specific time. *E. g.,* Brief for Appellees at 20.

No timetable for promulgation of this regulation was reported to the House Select Committee on OCS Oversight in 1980. *Oversight Hearings, supra* note 43, at 1272 (May 15, 1980).

**48.** 43 U.S.C. § 1344.

**49.** Sale A62 in the Gulf of Mexico took place on September 30, 1980. That sale involved cash bonus bidding with a fixed 33½ percent royalty

on 22 tracts, cash bonus bidding with a fixed sliding scale royalty on 59 tracts, cash bonus bidding with a fixed net profit share of 50 percent on 40 tracts, and cash bonus bidding with a fixed 16⅔ percent royalty on 71 tracts. 45 Fed.Reg. 55932 (Aug. 21, 1980).

Proposed sale notices have been issued for sale 55 in the Eastern Gulf of Alaska, 45 Fed. Reg. 37895 (June 5, 1980), scheduled for October 21, 1980, and sale 62 in the Gulf of Mexico, 45 Fed.Reg. 45872 (July 7, 1980), scheduled for November, 1980.

For sale 55 the Secretary proposed cash bonus bidding with a fixed sliding scale royalty on 32 tracts, cash bonus bidding with a fixed net profit share of 40 percent on 88 tracts, and cash bonus bidding with a 16⅔ percent royalty on the remaining 90 tracts.

For sale 62 the Secretary proposed cash bonus bidding with 33⅓ percent royalty on 11 tracts, cash bonus bidding with a fixed net profit share of 50 percent on 22 tracts, and cash bonus bidding with a 16⅔ percent royalty on 38 tracts.

**50.** *See* notes 41 & 47 *supra.* There appears to be no support for the district court's assertion that "defendants state that the Department of Energy is in the process of preparing regulations for the variable net profit share bidding system." Mem. op. at 7.

nus-fixed royalty bidding did not amount to an abuse of discretion. In moving for judgment on the first issue the government relied on two independent arguments: (1) OCSLA does not require issuance of regulations for all or any particular bidding system(s), and (2) even if OCSLA imposes an obligation to issue regulations on all the specified bidding systems, appellees are proceeding at a reasonable pace toward fulfilling this duty.

■ After the case was reassigned,[51] the district judge denied all the motions for summary judgment and appellants' motion for a preliminary injunction. The articulated reason for the refusal to grant the summary judgment motions was that the court found a genuine factual issue existed as to whether OCSLA requires the issuance of regulations for all the enumerated bidding systems before further leasing activity can take place.[52] Since, along with both parties,[53] we disagree with her conclusion that this is a factual issue which precludes granting summary judgment rather than a legal issue as to the Secretaries' obligations under OCSLA, we find it necessary as well as appropriate to construe OCSLA as it relates to the requirement to issue regulations on alternative bidding systems. Although cognizant of the absence of either a final judgment or certification pursuant to 28 U.S.C. § 1292(b), we nonetheless perceive no interests to be served by further delaying consideration of the basic statutory issue dominating this protracted litigation, a question of law which cannot be illuminated by the development of additional facts at trial. Reaching the critical legal issue now not only serves the interests of judicial economy, but provides essential guidance for the ongoing litigation upon remand.

We feel further justified in reaching this issue in order to decide the appeal of the refusal to enjoin the 1981 lease sales, which was not disposed of by our order of September 29, 1980. There is no question that jurisdiction exists to decide issues related to the surviving portion of the appeal from the denial of the preliminary injunction.[54]

---

51. Following a May 16 status conference before Judge Robinson, the parties filed their motions. The case was then transferred to recently appointed District Judge Johnson.

52. In denying appellants' motions the district court explicitly offered this reason, Mem. op. at 9, while in a separate order denying appellees' motion the court noted the existence of material facts in dispute generally, without explicitly identifying the nature of the factual disputes. *Energy Action Educational Foundation v. Andrus*, No. 1633 (D.D.C. Sept. 17, 1980) (order denying appellees' motion for summary judgment).

53. Brief for Appellee at 16 n.9; Brief for Appellant at 24.

54. 28 U.S.C. § 1292(a)(1). Courts, of course, are reluctant to consider the merits of the case on an appeal from an interlocutory order. *See, e. g., SEC v. Senex Corp.*, 534 F.2d 1240, 1241 (6th Cir. 1976); *Industrial Bank of Washington v. Tobriner*, 405 F.2d 1321, 1324 (D.C.Cir.1968); *Young v. Motion Picture Ass'n*, 299 F.2d 119, 121 (D.C.Cir.1962). They undoubtedly have jurisdiction to do so, however, under section 1292(a)(1), *E.P. Hinkel & Co., Inc. v. Manhattan Co.*, 506 F.2d 201, 204 (D.C.Cir.1974):

Review quite properly extends to all matters inextricably bound up with the remedial decision. . . . [T]he scope of review may extend further to allow disposition of all matters appropriately raised by the record, including entry of final judgment. Jurisdiction of the interlocutory appeal is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the court of appeals without further trial court development.

16 Wright, Miller, Cooper & Gressman, Federal Practice and Procedure § 3921 at 17 (1977).

Thus the Supreme Court has allowed a court of appeals to consider a motion to dismiss that was denied by the district court, when the motion was associated with an appealable interlocutory order, *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287, 61 S.Ct. 229, 232, 85 L.Ed. 189 (1940); so long as the decision on the merits is clear, judicial economy is obviously served by issuing a decision that will terminate or expedite the litigation. *See Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 52–53, 58 S.Ct. 459, 464–465, 82 L.Ed. 638 (1938); *Smith v. Vulcan Iron Works*, 165 U.S. 518, 525, 17 S.Ct. 407, 410, 41 L.Ed. 810 (1897). Courts of appeals have similarly issued merits decisions to help guide the course of litigation on remand, *Hagopian v. Knowlton*, 470 F.2d 201, 207 (2d Cir. 1972), or entered judgment for the plaintiff when the record demonstrated the pointlessness of further argument below, *Hurwitz v. Directors Guild of America, Inc.*, 364 F.2d 67 (2d Cir.), *cert. denied*, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966). The court, however, must restrict its merits decisions to

The basis for the district judge's denial of a preliminary injunction as reflected by her analysis of the likelihood that appellants would succeed on the merits, rested in substantial part on her view that OCSLA imposes *no obligation* on the Secretaries to issue regulations or to experiment with net profit share bidding so long as they "retreat from the sole and exclusive use of the cash bonus-fixed royalty bidding system and . . . develop and use other systems which promise to meet the goals and policies of the 1978 Amendments."[55] Accordingly, we proceed with an interpretation of the relevant portions of OCSLA, as they relate to the Secretary's duty to issue regulations on alternative bidding systems, particularly the variable net profit option specified in section 8(a)(1)(E) of the Act.

*OCSLA's Mandate to Experiment With Alternative Systems*

The purpose of section 8 of OCSLA is clear. Section 8 mandates the Secretary of the Interior to experiment over a five year period with alternative systems for OCS lease sales other than front end cash bonus bidding. The objective of the required experimentation is to arrive at the optimal system *or systems* in order:

(A) to make such resources available to meet the Nation's energy needs as rapidly as possible, (B) to balance orderly energy resource development with protection of the human, marine, and coastal environments, (C) to insure the public a fair and equitable return on the resources of the Outer Continental Shelf, and (D) to preserve and maintain free enterprise competition.[56]

To that end, the Secretary is authorized to utilize the seven specific bidding systems set out in section 8.[57] To further his experimental goals, he is also authorized to require bidders to bid under more than one

system simultaneously "in order to obtain statistical information to determine which bidding alternatives will best accomplish the purposes and policies of this subchapter."[58]

There is no issue as to the Secretaries' duty to experiment with alternative systems to traditional front end cash bonus bidding—the government terms it "uncontested" that the "Secretaries of Energy and Interior are obligated to experiment with alternative leasing systems to eventually determine the best possible approach to the development of gas and oil" in offshore reserves.[59] And indeed the legislative history of the Amendments is replete with assertions to that effect. For example, the House Committee Report states:

The leases have been [in the past] awarded by auction, traditionally on the basis of cash bonus bids. With the present shortage of investment capital that will prevail for many years, increasing risks of uncertainty, and the increasing integration and concentration of energy industries, there is now doubt whether cash bonus bidding remains the best system for the future. One purpose of H.R. 1614 is to authorize alternative leasing arrangements and *require experimentation with them.* It will enable the Secretary of the Interior, who administers the federal leasing program, to strike a proper balance between securing a fair return to the Federal Government for the lease of its lands, increasing competition in exploitation of resources, and providing the incentive of a fair profit to the oil companies, which must risk their investment capital.[60]

(Emphasis supplied.)

It was never in doubt that the purpose of section 8's authorization of the seven bid-

---

issues that are closely related to the interlocutory order on appeal. *Ex Parte National Enameling & Stamping Co.*, 201 U.S. 156, 26 S.Ct. 404, 50 L.Ed. 707 (1906).

**55.** Mem. op. at 11.

**56.** Section 102(2), 43 U.S.C. § 1802(2).

**57.** *See* note 7 *supra.*

**58.** 43 U.S.C. § 1337(a)(5)(A).

**59.** Brief for Appellees at 20.

**60.** H.R.Rep.No.95–590, *supra* note 16, at 54. Throughout consideration of the bill the Secretary of the Interior reiterated that "this Department is firmly committed to *substantial* use of bidding systems other than the existing cash

ding options was to foster experimentation with a five year period with new alternatives to the traditional cash bonus-fixed royalty bidding system:

> The obvious intention of the committee in revising the procedures for use of new bidding systems is to determine what system or systems in what situations, provide the best means to lease our federal resources in the Outer Continental Shelf. Subsection (a) is intended to provide procedures to answer this question.... to *mandat[e] use of new systems, to insure they are tested and studied,* and to provide for random selection, to insure fair tests and studies, ... [61]

(Emphasis supplied.) The Senate Committee Report was in accord that section 8's purpose was "to assure *that the new leasing systems would be tried.*" [62] (Emphasis supplied.)

The Conference Committee Report also stressed the obligation of the Secretary to test the new leasing systems. In rejecting a House provision that tracts utilizing different bidding systems be selected on a "random" basis, the Conference Report nonetheless admonished:

> Although there is no requirement for random selection, the Secretary, in setting forth systems for use on tracts, shall seek to secure a fair selection of different methods on different tracts. The purpose of such a selection is *to assure that adequate information is obtained as to relative advantages and disadvantages of the various bidding systems,* including the

front-end bonus bid systems as applied to different types of tracts, having different expectations of the amount of hydrocarbon that can be recovered. [63]

(Emphasis supplied.)

The government's contention, as we understand it, is that although there is a generalized obligation to experiment, the Secretary is free to choose to experiment with some but not other bidding system options. We do not believe that the legislative history supports this position insofar as it would allow him to ignore the options that do not involve front end cash bonuses as the bidding variable. Rather, it strongly suggests to us that Congress was particularly interested in assuring that the non-cash bonus variable bidding systems be tried at least during the five year period to determine their potential to attract bidders other than the major oil companies who had dominated the bidding under the pre-1978 OCSLA system.

Thus the Senate Committee Report emphatically stated:

> [The proposed act] authorizes a wide variety of *new bidding systems.* These are designed *to reduce the front end cash bonus,* increase the government's return on actual production of oil or gas, make it easier for smaller companies to enter the OCS development business, and increase the availability of funds for exploration. [64]

(Emphasis supplied.)

The mandate of the House Committee Report was equally vigorous: "It was the

bonus system." (Emphasis supplied.) *See, e. g.,* S.Rep.No.95–284, *supra* note 17, at 155, 110, 146. (Letters from Secretary Andrus to Chairman Jackson); *see also id.* at 119 (Statement of John O'Leary, Administrator, Federal Energy Administration) ("I can assure you that under this Administration *a variety of new systems* will be used") (emphasis supplied). *But see* the post-enactment testimony at *Oversight Hearings, supra* note 43, at 580 (Feb. 6, 1980) (Statement of Dr. John Sawhill, Deputy Secretary, Department of Energy) ("I am not sure it is appropriate for us to issue regulations in every area. I don't think we should issue regulations just for the sake of issuing regulations. On the other hand, I do think we have to be more aggressive.") *and id.* at 1289 (May 15, 1980) (Statement of R. Dobie Lagenkamp, Dep-

uty Asst. Secretary, Oil, Natural Gas and Shale Resources, Department of Energy) ("the congressional mandate is clear and I think in another year or so we may be able to pass some judgments on the alternative bidding systems. They are not going to be used universally. They are going to be used on an experimental basis.").

**61.** H.R.Rep.No.95–590, *supra* note 16, at 140. *Cf.* Minority Views, *id.* at 302–03 (objecting to the *mandatory* use of new bidding systems).

**62.** S.Rep.No.95–284, *supra* note 17, at 47, 73.

**63.** H.Rep.No.95–1474, *supra* note 22, at 92.

**64.** S.Rep.No.95–284, *supra* note 17, at 46.

intention of the Committee that there be a clear mandate given to the Secretary to require him to use bidding systems other than the cash bonus bid." [65]

Both the Senate and the House Committee Reports state:

The basic thrust of all these new options is to *reduce the reliance on large front-end cash bonuses* as the means of obtaining a fair price for the public's property. The committee wants to authorize lease allocation systems that would *encourage the widest possible participation in competitive lease sales* consistent with receipt by the public of fair market value for its resources. The committee believes that [*net profit share* and other] arrangements can be effective in shifting Government revenue *away from initial bonuses* and into deferred payments made out of a lease-holder's profits based on actual production of oil or gas.[66]

The Conference report also adopted the basic thesis that:

Bidding systems *other than bonus bidding, including royalty, net profit, work commitment, and non-enumerated sys-*

*tems* (emphasis supplied), are to be utilized in at least 20 percent and not more than 60 percent of the tracts offered for leasing in all OCS areas during each of the next 5 years.[67] (Emphasis in original.)

In view of these statements, we find it difficult to give credence to a view of the Act which would permit the Secretaries to totally ignore prominently mentioned new non-cash bonus bidding alternatives without any testing at all, even if they have otherwise satisfied OCSLA's minimum percentage requirement for experimenting with new leasing systems.

Indeed we note that at one point in the legislative history of the 1978 Amendments, a proposed amendment was defeated on the House floor that would have allowed the Secretary "complete flexibility" to decide whether or not to issue regulations or utilize any specific alternative bidding systems. Representative Murphy, House manager of the bill, was adamantly opposed on the ground that "this amendment strikes at the very heart of this bill—promotion of competition." [68]

**65.** H.R.Rep.No.95–590, *supra* note 16, at 139.

**66.** S.Rep.No.95–284, *supra* note 17, at 73; H.R.Rep.No.95–590, *supra* note 16, at 139. Material in brackets appears in Senate Report only. The Senate Report noted that while

[t]hese alternatives may not be "the perfect solution" . . . they should facilitate entry into the OCS development business of more independent producers and are certainly worth trying on an experimental basis.

S.Rep.No.95–284, *supra* note 17, at 47. The House Report noted testimony:

that the high front end bonus bids may have created a barrier to the entry of small and medium-sized oil firms as well as other potential exploiters to the OCS activity, and that these types of bids do not, after the completion of exploitation of a lease area, provide a fair return to the Government.

H.R.Rep.No.95–590, *supra* note 16, at 138–39. And the House Report stated that:

To increase competition for offshore leases and secure higher returns to the public Treasury, section 8 of the Outer Continental Shelf Lands Act has been amended to allow the Secretary *to use other bidding methods based on net profits; royalty; or work commitments stated in dollar amounts.*

*Id.* at 47 (emphasis supplied).

**67.** H.R.Rep.No.95–1474, *supra* note 22, at 92. *See also* H.R.Rep.No.95–1835, 95th Cong., 2d Sess. 15 (1979) (Interim Report on the Activities of the Select Committee on the OCS During the 95th Congress); H.R.Rep.No.96–1214, 96th Cong., 2d Sess. 14 (1980) (Final Report on the Activities of the Select Committee on the OCS) which both state:

The 1978 Amendments provide for the use of *new* bidding systems including *variable* royalty, *variable net profit, fixed net profit,* and *work commitment bidding alternatives.* It [is] hoped that these new systems will increase OCS competition, more efficiently allocate scarce capital, and increase ultimate resource recovery.

\* \* \* \* \* \*

Bidding systems *other than bonus bidding, including royalty, net profit, work commitment,* and nonenumerated systems are to be utilized in at least 20 percent and not more than 60 percent of the tracts offered for leasing in all OCS areas during each of the next 5 years.

(Emphasis supplied.)

**68.** *See* 124 Cong.Rec. H420–32 (daily ed. Jan. 31, 1978). Rep. Treen introduced an amendment which would have allowed the Secretary to

Representative Murphy objected strongly for the following reasons:

During its almost 3 years of hearings, the committee heard repeatedly about the lack of competition in offshore leasing. In fact, the reason for this lack of competition is because of the present bidding system—the use of high front-end bonus bids which create a barrier for the entry of small and medium-sized oil firms as well as other potential exploration and development companies. . . . After much discussion, and much debate, the committee decided to include many new bidding options as part of the Outer Continental Shelf Lands Act.

\* \* \* \* \* \*

This mandate of use of new bidding systems is strongly supported by the present Carter administration. *Recognizing the need to not only to experiment but use new bidding systems, the Secretary of the Interior has repeatedly stated to our committee that he believes that* *having such a mandate will be a positive incentive to doing extensive and detailed background, experimentation, and follow-up on new bidding systems.*

\* \* \* \* \* \*

The present provision therefore provides an incentive to use new bidding systems, and sufficient flexibility to the Secretary of Interior to experiment, study and finalize the use of the new bidding system. . . . [69]

(Emphasis supplied.)

During the debate that preceded defeat of the aforementioned amendment, numerous legislators, from both the majority and minority parties, reiterated their belief that experimentation with new non-cash bonus bidding systems was and should remain mandatory under the bill.[70]

We conclude therefore from a reading of the legislative history that the Secretary of Energy does have a statutory obligation to promulgate regulations on the

propose any of the seven new bidding systems described in the committee bill, or any other new bidding system the Secretary wants to provide for. He *may* provide for these by regulation, but we do not mandate any particular new system . . . . He does not have to use any of these systems at all. (Emphasis supplied.)

69. *Id.* at H420–21.

70. *Id.* at H421 (remarks of Rep. Miller) ("I think we see with the increase in royalty bidding, with the increase in net profit sharing, and with sliding royalties, that for the first time we will have major competition."); *id.* at H423 (remarks of Rep. Rousselot) ("These experimental systems should be used but we should remember that they are just that—experimental. The Secretary should be mandated to use them in order to conduct experiments to determine their worth; however, the percentage of use should be smaller . . . ."); *id.* at H424 (remarks of Rep. Miller) ("I suggest we give the Secretary the mandate to go out and use these alternative . . . systems, so we can get the greatest amount of participation and also have the greatest chance of producing revenues"); *id.* at H425 (remarks of Rep. Brown) ("Only by experimentation will the suitability of the various bidding systems become known"); *id.* at H425 (remarks of Rep. Hughes) ("Why we in this legislation directed the Secretary to utilize the alternative systems is because we want to give the alternative systems a fair chance, something they have not had in this country in the entire 25 years of oil and gas development in America. We want to give these other systems a fair trial"); *id.* at H426 (remarks of Rep. Hughes) ("But I think the fact of the matter is that we need to send a clear signal to the Secretary of the Interior to utilize in a realistic fashion during the next 5 years systems other than the bonus bidding systems"); *id.* at H427 (remarks of Rep. Fish) ("These experimental systems should be used. There is, once again, no dispute between the minority and the majority on that subject, but we should remember the new alternative, experimental systems are just that—experimental. The Secretary should be mandated to use them in order to conduct experiments but the percentage must be smaller than is proposed in the committee bill . . . ."); *id.* at H429 (remarks of Rep. Murphy) ("The language in the bill at the present time requires competition in the leasing arrangements on the Continental Shelf . . . . At the present time we find almost 100 percent of the bidding is the bonus-bid, up-front, big cash-expenditure type of bidding that dominates the sale of tracts in the Outer Continental Shelf. The purpose of the committee saying that the Secretary should utilize alternate forms of bidding for only 5 years is that after 5 years the Secretary will have made his analysis as to which are the most cost-effective methods of bidding on the public lands.")

major alternatives to front end cash bonus bidding, including the variable net profit share bidding option so as to allow experimentation with such a system to take place during the five year period specified for such experimentation.[71]

*The Pace of Implementing OCSLA*

As of this date, over two years after passage of the Act, regulations have not been issued nor consequently has there been any experimentation with three of the seven bidding systems enumerated in OCSLA, two of which do not involve cash bonus bidding.[72] The government has argued strenuously, nonetheless, that Congress in its oversight capacity has condoned the failure to experiment with or issue regulations on variable net profit or work commitment bidding systems. Congress has kept abreast of the development of the OCSLA bidding systems, primarily through the activities of a House Select Committee on OCS Oversight ("Oversight Committee").[73] Appellees would imply Congressional approval as to their pace in implementing OCSLA by virtue of the Oversight Committee's silence. It is, of course, the earlier Congressional *action* in adopting OCSLA rather than subsequent Congressional *inaction*, to which we must look primarily for reliable guidance in determining the scope of appellees' obligations under the Act.[74] But, even if we are to weigh the expressions of a post-enactment committee significantly on the intent of an earlier Congress that passed the legislation, we find little sustenance in the hearings and report of the Oversight Committee on this specific issue. In its 1979 report the Oversight Committee warned: "If sales are less than competitive, *if new systems are not used*, if fair market value is not obtained, action might be necessary."[75] (Emphasis supplied.) It anticipated that "During the next two years, *new regulations are to be promulgated,* new leasing programs prepared, *new bidding systems established and applied....* During the next two years most frontier areas will be leased and exploration in some frontier areas substantially completed."[76] (Emphasis supplied.)

In December, 1979 the Committee held hearings on the implementation of alternative bidding systems and was told by Energy officials that "in the near future [Energy] will be publishing final regulations dealing with alternative bidding systems."[77] In those same hearings, one of appellants here, Energy Action Educational Foundation, urged issuance of regulations dealing with both fixed and variable net profit share bidding, while Energy and Interior officials informed the Committee of their progress on fixed net profit share bidding and other alternatives avoiding any mention of variable net profit bidding at all.[78]

---

**71.** A prerequisite to the mandated experimentation is issuance of a regulation. Regulations have not been issued at this time for the alternatives specified in sections 8(a)(1)(E)–(G). *See* note 7 *supra.* The Act also requires the Secretary of Energy to report to Congress on the nonuse of bidding systems in an annual report mandated by section 8(a)(9) of OCSLA. 43 U.S.C. § 1337(a)(9).

**72.** *See* note 71 *supra.* Cash bonus bidding is not involved in alternatives specified in paragraph (E) and (G) of section 8(a)(1). 43 U.S.C. §§ 1337(E), (G).

**73.** *See generally* H.R.Rep.No.96–1214, *supra* note 16, esp. at 22–56.

**74.** In general, " '[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one'." *CPSC v. GTE Sylvania, Inc.,* 447 U.S. 102, 100 S.Ct. 2051, 2060–61, 64 L.Ed.2d 766 (1980) (*quoting United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960)). There is, however, reason to give somewhat greater weight than usual to the views of a post-enactment oversight committee charged with responsibility for supervising the administration of the Act. It is also noteworthy that in this present case the Chairman of the Oversight Committee, Rep. Murphy, was also the floor manager of the House bill.

**75.** H.R.Rep.No.95–1835, *supra* note 13, at 14.

**76.** *Id.* at 25.

**77.** H.R.Rep.No.96–1214, *supra* note 16, at 49.

**78.** *See* Oversight Hearings, *supra* note 43, at 448 (Nov. 15, 1979), 810 (April 15, 1980), 910 (April 29, 1980) (Statements of Edwin Rothschild, Director, Energy Action Educational Foundation); *and* at 494–95 (Dec. 4, 1979)

The final report of the Oversight Committee then concluded that "the implementation process has proceeded reasonably well, but there have been delays as exemplified by the jurisdictional conflict between [Interior] and [Energy]"; it recommended, accordingly, "interagency coordination must be enhanced ... and the issuance of [Energy] regulations in its five major areas of responsibility [should take place] by January 1, 1981." [79]

■ It is thus difficult for us to construe the Oversight Committee's statements as excusing appellees from what we construe as a statutory obligation to issue regulations necessary to allow all bidding options under section 8 to be tested in some fashion during the five year "experimental" period.

It seems more likely to us that the Oversight Committee (either intentionally or unintentionally) simply avoided directly resolving any implicit conflict between Energy Action's plea for action and the Department of Energy's silence with respect to issuance of regulations on variable net profit bidding. We must, consequently, look almost entirely to the original legislative history preceding enactment for our guidance and we construe that history as requiring good faith experimentation with noncash bonus alternatives.

We also note that appellees have never, in fact, stated in the annual reports to Congress required by the Act that they do not intend to utilize a variable net profit bidding system.[80] In contrast the Depart-

(statement of R. Dobie Langenkamp, Deputy Asst. Secretary, Oil, Natural Gas and Shale Resources, Department of Energy); at 542, 545 (Feb. 6, 1979) (statement of Cecil D. Andrus, Secretary, Department of Interior); at 580 (Feb. 6, 1980) (statement of John Sawhill, Deputy Secretary, Department of Energy).

Regulations for some form of work commitment bidding system were reported to be under consideration and scheduled for promulgation in fiscal year 1981. *Id.* at 810 (April 15, 1980), 920 (April 29, 1980) (statements of Edwin Rothschild); *id.* at 1270 (May 15, 1980) (statement of R. Dobie Langenkamp) (work commitment bidding system will be out "sometime in the fall"); *id.* at 1272 (May 15, 1980) (Timetable for Issuance of OCS Regulations) (Regulation for work commitment system projected Dec. 1980).

**79.** H.R.Rep.No.96–1214, *supra* note 16, at 70.

**80.** *See* Department of Energy: *Report to Congress on Various Bidding Options Utilized in FY–79 Lease Sales on the OCS; and* the FY–78 Report, *supra* note 45, J.A. 232. These annual Energy Reports are prepared pursuant to 43 U.S.C. § 1337(a)(9), which provides:

(9) Within six months after the end of each fiscal year, the Secretary of Energy, in consultation with the Secretary of the Interior, shall report to the Congress with respect to the use of various bidding options provided for in this subsection. Such report shall include—

(A) the schedule of all lease sales held during such year and the bidding system or systems utilized;

(B) the schedule of all lease sales to be held the following year and the bidding system or systems to be utilized;

(C) the benefits and costs associated with conducting lease sales using the various bidding systems;

(D) if applicable, the reasons why a particular bidding system has not been or will not be utilized; and

(E) if applicable, the reasons why more than 60 per centum or less than 20 per centum of the area leased in the past year, or to be offered for lease in the upcoming year, was or is to be leased under the bidding system authorized by subparagraph (A) of paragraph (1) of this subsection.

*See also* Department of the Interior: *OCS Oil and Gas Leasing: An Annual Report on the Leasing and Production Program, Fiscal Year 1979* (October 20, 1980) *and Fiscal Year 1978* (December 1979). The Interior Reports are prepared pursuant to 43 U.S.C. § 1343(2), which provides:

§ 1343. Annual Reports by Secretary to Congress. Within six months after the end of each fiscal year, the Secretary shall submit to the President of the Senate and the Speaker of the House of Representatives the following reports:

\*   \*   \*   \*   \*   \*

(2) A report prepared after consultation with the Attorney General, with recommendations for promoting competition in the leasing of outer Continental Shelf lands, which shall include any recommendations or findings by the Attorney General and any plans for *implementing recommended admin*istrative changes and drafts of any proposed legislation, and which shall contain—

(A) an evaluation of the competitive bidding systems permitted under the provisions of section 1337 of this title, and, if applicable, the reasons why a particular bidding system has not been utilized;

ment of Energy has utilized the end of the year report to announce its dissatisfaction with royalty bidding.[81]

██ Appellees also argue that because "the basic thrust of *all* these new options is to reduce the reliance on large front end cash bonuses as a means of obtaining a fair price for the public's property," [82] it is sufficient to utilize only some of the enumerated bidding methods. Again, the legislative history is too emphatic about the prominent role of the new, and as yet untried non-front end cash bonus options to permit so liberal an interpretation of the mandate on experimentation. It may well be that one or more of these new options, when tested may prove unsatisfactory, but it is not credible that the Secretaries can permissibly reject them out of hand, when the statutory history is explicit regarding Congressional interest in maximizing competition and encouraging "the widest possible participation" in lease sales.

██ Alternatives like the variable net profit share bidding option (and the work commitment bid system) are designed to reduce front end cash payment and to stimulate competition to a greater degree than the options already in place which still focus bidding on the front end cash bonus. Although we obviously cannot determine at this point whether the non-cash bonus variable systems will have the salutory effect in practice that their supporters claim, acquiring this information is precisely the objective of the Congressionally mandated experimentation with new systems.

██ It is also clear to us that the obligation to experiment with "net profit share" bidding so frequently referred to in the Committee reports and floor debate is not fully satisfied solely through experimentation with *fixed* net profit share bidding. The statute itself sets out as distinct alternatives two types of net profit share bidding—fixed and variable—to be experimented with in the five year period. The variable net profit bidding alternative represents the more innovative alternative, and the greater departure by far from the traditional cash bonus system. The separate provision for the variable net profit share bidding alternative in section 8(a)(1)(E) did not materialize out of thin air; its origins may be traced to specific testimony and dialogues between legislators and witnesses about this particular type of bidding while OCSLA was pending before Congress. During the hearings several witnesses and legislators exhibited significant interest in and knowledge of *variable* net profit share bidding; [83] comparisons were made between

---

(B) an evaluation of alternative bidding systems not permitted under section 1337 of this title, and why such system or systems should or should not be utilized;

(C) an evaluation of the effectiveness of restrictions on joint bidding in promoting competition and, if applicable, any suggested administrative or legislative action on joint bidding;

(D) an evaluation of present measures and a description of any additional measures to encourage entry of new competitors; and

(E) an evaluation of present measures and a description of additional measures dealing with supplies of oil and gas to independent refiners and distributors.

*See* H.R.Rep.No.95–1835, *supra* note 13, at 30:
Use of new systems can be avoided by the Secretary of Interior in certain circumstances. *Congress must assure that new systems are effectively utilized or if not used that adequate reasons are detailed.*
(Emphasis supplied.)

81. *See* Energy's FY–78 Report, *supra* note 45, at 18, J.A. 232, 249. Appellees' annual reports

also have not invoked the so-called "escape hatch" clause of section 8(a)(5)(B) of the Act. *See* note 21 *supra.*

82. Brief for Appellees at 31, *citing* S.Rep. No. 95–284, *supra* note 17, at 139 (quotation at 73).

83. *See, e. g., Hearings Before the Ad Hoc Select Committee on the Outer Continental Shelf on H.R. 1614 (House of Representatives),* 95th Cong., 1st Sess. (1977) [hereinafter *"House Hearings on H.R. 1614"*] at 784–89 (statement of Dr. Walter Mead, Dept. of Economics, U.C. at Santa Barbara); at 941 (statement of T. F. Hart, Vice President, Shell Oil Co.); at 1091, 1106–20 (statement of Richard H. Bowerman, Associated Gas Distributors); at 1197 (statement of John T. Loftis, Jr., Senior Vice Pres., Exxon Oil Co.); at 1491–1500 (statements of Lynn Adams and William Miller, Domestic Petroleum Council); *and see Hearings Before the Committee on Energy and Natural Resources on S. 9, 95th Cong., 1st Sess. (1977) (Senate)* [hereinafter *"Senate Hearings on S. 9"*]; at 231 (colloquy between Robey Clark, Diamond

variable royalty and variable net profit options; comparisons which usually favored variable net profit bidding.[84] Discussions were also held on the differences between variable net profit share bidding and variable cash bonus-fixed net profit share bidding.[85] The testimony about variable net profit bidding was by no means all favorable; concerns were expressed that it would encourage irresponsible bidders; discourage perseverance in drilling; would be costly and complicated to administer and involve the government too deeply in the oil and gas business.[86] Yet even some of its vigorous opponents suggested it might prove useful and attractive for particular tracts.[87] Representatives of the gas distribution industry, among others, affirmatively advanced a variation of this option.[88] Senator Johnston questioned several witnesses specifically about the variable net profit share method.[89] Although subsequent to enactment the distinction between fixed and variable profit sharing options seems at times to have blurred,[90] the pre-enactment record reveals a clearer focus, among key witnesses and legislators, on the two distinct options dealing with profit share bidding, a recognition ultimately reflected in the express language of section 8 of the Act. Particularly in light of assurances by administration witnesses that "all" alternative options to cash-bonus bidding would be tried[91] we do not think it a reasonable

---

Chemical Oil, and Sen. Johnston); at 286 (colloquy between Lynn Adams, Domestic Petroleum Council, and Sen. Johnston); at 369–72 (colloquy between T. F. Hart and Sen. Johnston); at 530 (statement of Robert LaResche, Commissioner of Natural Resources, State of Alaska).

**84.** *House Hearings on H.R. 1614, supra,* note 83, at 1496–1501. The Domestic Petroleum Council presented a detailed analysis of cash bonus bidding, net profit bidding, and royalty bidding that concluded "royalty bidding is the least attractive." *Id.* at 1499. *See Senate Hearings on S. 9, supra* note 83, at 286 (statement of William Miller) ("no question" net profit variable bidding is better than gross royalty variable bidding).

**85.** *See, e. g., Senate Hearings on S. 9, supra* note 83, at 372 (statement of T.F. Hart, Shell Oil Co.) (fixed net profit option is an "entirely different story" from variable net profit bidding, "a situation . . . we can live with.").

**86.** *See, e. g., House Hearings on H.R. 1614, supra* note 83, at 784–789 (statement of Dr. Mead, Dept. of Economics, U.C. at Santa Barbara); at 941 (statement of T.F. Hart, Shell Oil Co.); at 1197 (statement of John Loftis, Exxon Oil Co.); at 1493–1495 (supplementary statement of Domestic Petroleum Council). *But compare Senate Hearings on S. 9, supra* note 83, at 530 (statement of Robert LaResche, Commissioner of Natural Resources, State of Alaska); *House Hearings on H.R. 1614, supra* note 83, at 1234 (statement of James F. Flug, Energy Action Committee); at 1085, 1091, 1106–20, 1136–37 (statement of Richard Bowerman, Associated Gas Distributors).

**87.** *Senate Hearings on S. 9, supra* note 83, at 371 (colloquy between T.F. Hart and Sen. Johnston):

Senator Johnston. You are making a very strong case here, Mr. Hart. Does that mean in all cases it would never be a good thing to have discretionary net profit bidding?

Mr. Hart. I can envision, and we can build this case for you, a few windows in this picture, and this would have to do with critical sizes of fields found and critical costs of platforms, where net profits might be somewhat more attractive in the sense we go for the oil rather than if we had bonus bid. Small windows, and by definition, marginal fields.

**88.** *House Hearings on H.R. 1614, supra* note 83, at 1111 (statement of Richard H. Bowerman, *Associated Gas Distributors*) (variations of net profit bidding would "increase the opportunity for participation in the most promising remaining exploration areas, the offshore, by the distribution company, the element of the gas industry whose interest in new gas supply most closely approaches that of the consumer and the federal government. . . .").

**89.** *Senate Hearings on S. 9, supra* note 83, at 245, 286, 371.

**90.** *See* pp. 742–743 *supra.* During the post-enactment hearings of the Oversight Committee, Energy did, however, specify that the imminently expected regulations on "net profit share bidding" involved cash bonus as the bid variable with net profit share at a fixed rate. *See Oversight Hearings, supra* note 43, at 494–95 (Dec. 4, 1979) (prepared statement of R. Dobie Langenkamp, Deputy Asst. Secretary, Oil, Natural Gas and Shale Resources, Dept. of Energy).

**91.** *See, e. g., House Hearings on H.R. 1614, supra* note 83, at 204. Secretary Andrus stated:

construction of the Act that experimentation with variable net profit share bidding can be rejected.

## The Secretaries' Obligations At This Time

■ Having found in the language and history of the Act a Congressional imperative to promulgate regulations, as a necessary prelude to experimentation, involving non-cash bonus statutory bidding alternatives, including variable net profit share bidding, the critical question is when does such an obligation become due. Appellees argue that even if such an obligation exists, their pace in issuing regulations so far has been reasonable and OCSLA contains no specific deadlines for promulgation of particular regulations.[92] Indeed, appellees advance the circular assertion, noted by the district court, that the regulations have proceeded apace with the Secretary's desire to utilize particular bidding systems.[93]

We conclude that the obligation to promulgate regulations on net profit variable bidding must be fulfilled with the maximum possible speed consistent with procedural and statutory rulemaking requirements. Congress legislated five years as an "experimental" period with alternative bidding systems; that period began September 18, 1978, over two years ago. Even if the Secretary were to propose regulations tomorrow, it would still take well into 1981 before they could be finally promulgated, and we are aware that even the proposal of such regulations must be preceded by weighty deliberations.[94]

By mid-1981—before the next lease sale, now scheduled for May—the midway point in the five year experimental period for alternative bidding systems will have

---

While administrative flexibility is desirable, I am not concerned about the percentage mandate because of my *commitment* to *substantial* use of bidding systems other than the cash bonus system.

\*    \*    \*    \*    \*    \*

Given our commitment to insuring the bidding systems used are the best available, the Department is considering alternatives to identify those systems which should be tried first. Such alternatives include *profit sharing systems*, several variations of royalty bidding systems, and the Phillips plan . . . . *The Department will develop a program for testing and using these systems* even if a limit is not placed on the use of cash bonus bidding. *Id.* (emphasis supplied).

John O'Leary, Administrator, Federal Energy Administration, stated:

I think that we should do everything in our power to foster competition for leases. We should have a very deep support for the variations on the existing themes of leasing, and I believe there should be a more open system here with more people capable of coming in and getting positioned to develop this resource. I think we should have broad latitude to scrap the present system if it does not work, to keep it in place if it does *after a very very hard examination of all the alternatives.* Comparing our system with the system employed by European states with regard to the North Sea, they have achieved a successful result without their using the sort of competitive techniques that we have. This does not mean that they are right, but it does not mean that we are right either. I think we should have a *very open examination of al-*

ternatives and then get those that fit the case.

*Id.* at 211 (emphasis supplied).

Darius Gaskins, Director, Bureau of Economics, Federal Trade Commission, stated:

Before we limit ourselves to specific alternatives, we should carefully evaluate these alternatives in operation. One of the best features of this proposed legislation is that it will allow the selection of leasing systems based on practical experience rather than on theoretical studies of prejudgment.

*Id.* at 663.

92. They argue, not unreasonably, that bidding regulations require considerable study, coordination between the Energy and Interior Departments, consultation with the Department of Justice and the Federal Trade Commission, 42 U.S.C. § 7153(b), and in the case of net profit bidding, promulgation of regulations on the way in which profits will be calculated at least ninety days in advance of any sale. Appellees' Brief at 23, 27.

93. *See* Mem. op., *supra* note 41, at 7.

94. Nevertheless, we note that accounting regulations as to what constitutes "net profit" have already been promulgated prior to the issuance of the fixed net profit share regulations authorized by 43 U.S.C. § 1337(a)(1)(D) in 45 Fed. Reg. 36784 (May 30, 1980). When asked whether the same accounting system could be used in connection with a variable net profit system an Interior official indicated that he did not "know any reason why not." Heintz Deposition, *supra* note 44, at 122.

passed. If there is to be meaningful experimentation with variable net profit share bidding, then preparations for promulgation of the necessary regulations must begin immediately. The five year comprehensive leasing plan which went into effect in June, 1980 anticipates thirty-six lease sales, almost one-third of which will have been held by the end of 1981. If the variable net profit share bidding option is to have any kind of a fair trial, it would seem that it must be eligible to be utilized within the next year.[95]

The government correctly notes the understandable reluctance of courts to block scheduled lease sales until regulations on all enumerated bidding systems are issued.[96] This reluctance to upset the orderly administration of OCS leasing is most recently reflected in this court's affirmance of the district court's refusal to enjoin the three sales scheduled this fall.[97] Our deference to the discretion of the district court on this aspect of her ruling is grounded in the reasonableness of her conclusions regarding irreparable harm and the balance of public equities in the three sales scheduled for the end of 1980. We can, however, reasonably draw the line as to future sales now scheduled for late spring and the summer of 1981. First, it should be feasible for the needed regulations to be in place before the next round of sales. Second, given the relatively distant future date of the 1981 sales, if the schedule needs to be adjusted at all the likely cost and inconvenience should not be as substantial with several months advance notice as would have been the case for the three sales scheduled later this year. Most important, by mid-1981 failure to issue regulations on variable net profit share bidding and work commitment bidding creates a clear violation of the statutory mandate to experiment with alternatives to front end cash bonus systems and accordingly a clear case of irreparable harm to appellants, and the public and private interests they represent. Thus, the public harm in losing any realistic opportunity to test all the OCSLA leasing methods will outweigh any incidental delay to the transaction of additional lease sales. Further delay in issuing these regulations would mean that experimentation with these options could only occur, if at all, in the last year or two of the five year period, upon whatever tracts remain for exploration. This circumstance would in turn raise a serious question of whether a fair test of variable net profit sharing would be possible, if use of that option were consigned to the last of five years for sales of relatively few and possibly less significant tracts. While, as the government maintains, it may be advantageous to garner experience with one new bidding system before moving on to experiment with another,[98] we conclude the time has now passed when such advantages can be said to outweigh the disadvantages of failing to allow for any adequate testing or experimentation with the major non-cash

95. We do not of course make any ruling at this time that affects the Secretary of the Interior's discretion as to when and how much the variable net profit share option must be utilized once it becomes available by the issuance of regulations. We are assuming that regulations for a work commitment bidding system will be achieved in approximately the same time period. See note 46 supra.

96. Brief for Appellees at 33–34. See also, e. g., Oversight Hearings, supra note 43, at 1204–06 (letter from Alan A. Parker, Assistant Attorney General, to Rep. Murphy) (April 30, 1980). We agree with the Administration position that Congress did not intend to hold up all OCS leasing and development until all the regulations are promulgated. To do so would be to undervalue the stated statutory objectives of expediting development of the OCS and miti-

gating this nation's energy problems. However, it is also fair to say that Congress did not endorse a situation where significant non-cash bonus bidding methods it specified would not be tested in a significant manner. Hopefully, scheduled sales for 1981 need not be postponed or at least not delayed for any substantial time before the new regulations can be put in place.

97. Energy Action Educational Foundation v. Andrus, No. 80–2127 (D.C.Cir. Sept. 29, 1980) (partial affirmance of denial of preliminary injunction).

98. See, e. g., Brief for Appellees at 22–24. We are not unaware of the advantages that have been cited for trying new bidding options sequentially. E. g., 44 Fed.Reg. 70390, 70397 (Dec. 6, 1979).

bonus of Congressionally authorized bidding systems. In sum if there is to be significant experimentation with the range of non-cash options specified in the Act, the remaining regulations for those options should be in place in 1981, before the next battery of planned lease sales which begin in May, 1981.[99]

## III. CONCLUSION

For the foregoing reasons, it is our judgment that appellees have an obligation to issue regulations for the remaining two non-cash bonus bidding systems enumerated by Congress in section 8(a)(1)(E) and (G) of the Act and that the obligation to put the regulation-issuing process into operation vests immediately and should be completed in mid-1981. To conclude otherwise would be to find, against the weight of the legislative history, that Congress intended to allow two-thirds of the non-cash bonus variable bidding options it specified to go

untried or at best to be placed at an intolerable disadvantage in the five year experimental period despite Congress' explicit commitment to encouraging greater competition and broader participation in OSC development.

Upon remand, then, the district court should insure that, to the maximum extent feasible, regulations for the two non-cash bonus variable bidding options set out in section 8(a)(1)(E) and (G) are promulgated before further lease sales take place in 1981. The court, within its general equitable discretion to order or withhold injunctive relief in the public interest, after hearing from the Secretaries as well as the plaintiffs, should immediately proceed with the task of setting a precise timetable for their issuance that takes account of future scheduled lease sales as well as any other relevant information proffered by the parties.**

**99.** Should the new alternatives prove not to be promising bidding systems, the Secretary can, of course, subsequently report this determination to Congress as it did in the case of the variable royalty bidding option.

** The plaintiff-appellants (*see* note 6 *supra*) have standing to sue under section 23(a) of OCSLA, 43 U.S.C. § 1349(a), which authorizes citizen suits to compel compliance with the Act.

Appellees unsuccessfully challenged appellants' standing in 1979 before Judge Robinson (*see* Memorandum of the United States in Opposition to Motion for Preliminary Injunction, J.A. 174, 192–94), before this court on the previous appeal (*see* Energy Action, *supra* note 2, Brief of Appellees at 28) and again this year before Judge Johnson (*see* Energy Action, Civ. No. 1633, Brief for Defendants at 10–15, filed June 23, 1980, Docket No. 50; and Reply Brief for Defendants at 5–9, filed July 29, 1980, Docket No. 64). In contrast, on the present appeal the standing issue was neither briefed nor argued by appellees. When questioned at oral argument on September 26, 1980 about the subject of standing appellees merely indicated that they reserved but had elected not to press at this time their prior challenge to appellants' standing. Then, while the opinion for this expedited decision was at the printer, the court received appellees' motion for leave to file a supplemental brief on the standing issue.

Mindful of the strong policy reasons for restricting consideration of post-submission filings we nevertheless feel that now is a sensible time to dispose of the threshold jurisdictional

question reintroduced by appellees' belated assertion of appellants' lack of standing. We find the jurisdictional question to be straightforward and because we do not agree with appellees that appellants are without standing, we do not believe that appellants are prejudiced by not having the opportunity to submit supplemental argument for our consideration.

OSCLA expressly authorizes citizen suits like the present action and identifies who may bring the action:

[A]ny person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States ... for any alleged violation of any provision of this subchapter ....

43 U.S.C. § 1349(a). We believe appellants have such a valid legal interest both in their capacity as competitors and coproducers on the OCS with the federal government and in their capacity as representatives of consumers of the oil produced on the OCS. Furthermore, they have "a legal interest which is or may be adversely affected" by appellees' complained of conduct.

In essence, appellants claim injury because the failure to use non-cash bonus bidding and the continued predominant use of cash bonus bidding tend to reduce revenues to the federal government, to stifle competition on the OCS, and depress oil and gas production.

The California government appellants (the State Lands Commission, and the City of Long Beach) are competitors and coproducers on the

Note **—Continued

OCS with the federal government. As lessors and producers of OCS oil they allege concrete and tangible economic injury caused by appellees' failure to increase returns to the federal government on federal OCS leases. (Complaint ¶ 132, J.A. 1, 71–72) These two appellants posit a present and future disadvantage to their own OCS activity by their inability to compete for bidders who are attracted to the significantly higher returns to private investment available through federal leases. Additionally, appellants maintain that they could obtain a higher return in so-called "drainage" situations if appellees would utilize higher return bidding systems. In drainage situations the state is part owner with the federal government of an OCS site and shares in royalties generated by a lease on the site.

It is even more readily apparent that the consumer appellants have standing to sue for violation of an Act designed to increase competition and to step up utilization of energy resources on the OCS. Consumers are the ultimate beneficiaries of both vigorous competition and greater availability of domestic fuel. Here the consumer appellants contend that appellees' leasing activity causes direct harm to consumers by inflating prices, limiting supplies, and restricting choice on the market. This is the type of economic harm commonly present in consumer based litigation. See e. g., Consumers Union of the United States, Inc. v. Sawhill, 525 F.2d 1068 (T.E.C.A.1975); Consumer Federation of America v. FPC, 515 F.2d 347 (D.C.Cir.1975); Consumers Union of the United States, Inc. v. FPC, 510 F.2d 656 (D.C.Cir. 1974); see also Reiter v. Sonotone Corp., 442 U.S. 330, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) (consumers have standing under the Clayton Act); Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 72–81, 98 S.Ct. 2620, 2630–2634, 57 L.Ed.2d 595 (1978) (individuals and environmental and labor organizations have standing under the Price-Anderson Act). Cf. Metcalf v. National Petroleum Council, 553 F.2d 176 (D.C.Cir.1977).

In sum, the Act's grant of standing to persons "having a valid legal interest" which "may be adversely affected" includes consumers of oil and gas products who seek redress for the failure of the government to implement the provisions of OCSLA intended by Congress to foster competition and stimulate OCS development.

In the present case we are satisfied that both the California governmental appellants and the consumer appellants have a concrete stake in the outcome of the lawsuit. They have alleged a "distinct and palpable injury," Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), and have asserted a plausible theory for tracing this harm to appellees' challenged conduct. Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). This means that appellants not only

satisfy the statutory requirement for standing but, under established law, the constitutional requirements as well. United States v. SCRAP, 412 U.S. 669, 683–690, 93 S.Ct. 2405, 2413–2417, 37 L.Ed.2d 254 (1973).

To the extent there is uncertainty about the actual scope of the purported injury, this lack of information may be attributed in part to appellees, whose failure to test non-cash bidding alternatives is the cause of remaining speculation about the benefits of the non-cash bidding alternatives in practice. Moreover, by mandating use of non-cash bidding systems Congress has recognized a causal nexus between government OCS leasing activities and competition and energy production.

Appellees cannot rely on the legislative history of the Act to support a narrow reading of section 23(a). We have already noted that the interests of parties like appellants, and their desire to obtain a greater role in the course of OCS development, were among the significant forces which lead to the OCSLA revisions of 1978 (see pp. 739–740 supra). There is no indication that Congress intended to preclude this type of private party from filing citizen suits under section 23(a). On the contrary, the House Report states:

> [Section 23(a)] provides that suits may be brought by "any person having a valid legal interest which is or may be adversely affected." Thus, the scope of persons who can sue are those who can show an actual interest that is being negatively affected, or will be negatively affected at a reasonable time in the future. The interest must be discernible and ascertainable. Standing to sue includes not only those who have an economic interest, or who have suffered or will probably suffer a tortuous [sic] injury, but also those who may have a definable aesthetic or environmental interest. Specifically, the Committee intends that this includes persons who meet the requirement for standing to sue set out by the Supreme Court in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

H.R.Rep.No.95–590, supra note 16, at 161. (Emphasis supplied) Here appellants represent that their economic interests have been and will be harmed. The injury that they specify is at least as discernible and ascertainable as the "aesthetic" and "environmental" interests which could, according to the House Report, give rise to a suit. Subsequent to enactment, the Oversight Committee specifically took note of pending lawsuits by citizens groups involving the OCS including this one. H.R.Rep.No.96–1214, supra note 16, at 59–63; H.R.Rep.No.95–1835, supra note 13, at 20–22. The Oversight Committee indicated that the concern of section 23 was to provide for orderly resolution of such OCS litigation. E. g., H.R.Rep.No.96–1214, supra note 16, at 18–19. It was apparent that the Committee felt that the way to forestall litigation and to avoid delay in development of the OCS was to implement the new provisions of

Remanded for proceedings consistent with this opinion

OCSLA rather than, as appellees would have it, deny private groups access to court by narrow-

ly construing section 23(a). H.R.Rep.No.95–1835, *supra* note 13, at 20–22.